# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

IN RE:

**A&B VALVE AND PIPING SYSTEMS, L.L.C.**    **CASE NO. 15-51336**
    **TAX ID NO.  XX-XXX1417**

**KIMZEY CASING SERVICE, LLC**    **CASE NO. 15-51337**
    **TAX ID NO.  XX-XXX3980**

**SHEFFIELD HOLDINGS, LLC**    **CASE NO. 15-51338**
    **TAX ID NO.  XX-XXX0324**

**SHEFFIELD GP, LLC**    **CASE NO. 15-51339**
    **TAX ID NO.  XX-XXX6709**

**DEBTORS**    **(JOINT ADMINISTRATION REQUESTED)** [1]

## DECLARATION OF RYAN A. MAUPIN IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1746, I, **Ryan A. Maupin**, declare as follows under penalty of perjury:

    1.    My name is Ryan A. Maupin, I am over the age of twenty-one and am competent to make this Declaration of Ryan A. Maupin in Support of the Chapter 11 Petitions and First Day Motions.

    2.    After receiving a Bachelor of Science degree from Millikin University, I gained 13 years of restructuring and financial advisory experience, including my current role as Director for Grant Thornton's Corporate Advisory and Restructuring Services practice.  The majority of my professional career has been focused on advising distressed companies or stakeholders on financial restructuring alternatives in either chapter 11 or out-of-court situations. I am a member of the American Bankruptcy Institute, the Turnaround Management Association and the Association of Insolvency and Restructuring Advisors.

    3.    I am the interim Chief Executive Officer of A&B Valve and Piping Systems, LLC ("A&B") and its direct and indirect subsidiaries, Kimzey Casing Service, LLC, Sheffield GP, LLC, and Sheffield Holdings, LP (collectively, the "Debtors" or the "Company").   After

---

[1]    The Debtors have concurrently filed a Motion for Order Under Bankruptcy Rule 1015(b) Directing Joint Administration of Chapter 11 Cases seeking the joint administration of the cases of Kimzey Casing Service, LLC (15-51337); Sheffield GP, LLC (15-51339); and Sheffield Holdings, LP (15-51338) with A&B Valve and Piping Systems, LLC (15-51336).

1

consulting for the Company in 2014 as its financial advisor, I was recently retained by the Company to become familiar with its day-to-day operations, business, and financial affairs.

4.      On October 16, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for Western District of Louisiana (the "Court").  The Debtors intend to continue in the possession of their properties and the management of their businesses as Debtors in possession under the Bankruptcy Code.

5.      The First Day Motions seek relief aimed at preserving the going concern value of the Debtors' estates and minimizing the adverse effects of the chapter 11 filing on the Debtors' businesses by facilitating an orderly transition into, and uninterrupted operations throughout, the chapter 11 process.

6.      Unless otherwise stated, the facts set forth in this Declaration are based upon my personal knowledge as an officer of the Debtors, my review of relevant documentation, market data and financial information, information provided to me by employees of, and professional advisors retained by, the Debtors, and my opinions based upon my knowledge and information concerning the Debtors' operations, industry and financial affairs.

7.      Unless otherwise indicated, the financial information set forth in this Declaration is unaudited.

8.      I submit this Declaration to explain, among other things, to this Court and other interested parties the circumstances surrounding the Debtors' determination to seek relief under chapter 11 of the Bankruptcy Code.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## THE DEBTORS' BUSINESSES

### General Background

6.      A&B is a Louisiana limited liability company engaged in the business of stocking and distributing pipes, valves, fittings, flanges, fasteners, and general oilfield supplies primarily in Louisiana and Texas.  A&B was formed in 2009.  Shortly thereafter, A&B merged with A&B Valve and Piping Systems, LP, a Texas limited partnership (the "A&B Predecessor").  A&B maintains its principal office in Broussard, Louisiana, and is the ultimate parent entity of the Company, as illustrated below:

2



7.      Kimzey Casing Service, LLC ("<u>KCS</u>") is a Texas limited liability company that is 100 percent owned by A&B.  KCS is engaged in the business of providing casing running services for oil and gas drilling primarily in Colorado, Pennsylvania and West Virginia.  KCS was formed by the A&B Predecessor in 2007 and has its headquarters in Denver, Colorado.

8.      Sheffield Holdings, L.P. ("<u>Sheffield</u>") is a Pennsylvania limited partnership formed in 2012 to acquire real estate in Washington County, Pennsylvania.  Sheffield is 99 percent owned by A&B and 1 percent owned by Sheffield GP, LLC ("<u>GP</u>"), a Pennsylvania limited liability company formed in 2012, and 100 percent owned by A&B.  The real estate owned by Sheffield is rented to KCS.

### <u>The Debtors' Operations</u>

9.      A&B is an operating and holding company.  The business operations of A&B are primarily stocking and distributing a broad array of products consisting primarily of pipes, valves, fittings, flanges, fasteners, and general oilfield supplies to the upstream and midstream oil and gas industries. A&B operates six leased warehouse facilities in Louisiana and Texas, with each maintaining a unique product inventory with thousands of items.  A&B sources its products from hundreds of manufacturers and distributors. Nearly all of A&B's business involves work on an order-by-order basis without long-term contractual commitments by customers.  Such orders typically involve multiple items, some of which A&B has in inventory and others that must be sourced from third parties.   Due to the long lead-time for sourcing certain items, A&B historically purchases these inventory items in anticipation of customer orders and upcoming projects. A&B's aggregate inventory at cost is approximately $13.1 million.[2] A&B maintains its own fleet of 116 trucks and trailers and also uses third party logistics providers to deliver products to its customers.   As of the Petition Date, A&B has approximately 73 full-time employees, including 5 insiders.

10.      KCS employs specialized crews and heavy trucks and equipment to provide casing installation services for oil and gas wells.  Well casing consists of a series of steel pipes that are installed in all oil and gas wells after they have been drilled.  Casing prevents the walls of the wellbore from caving in, prevents the uncontrolled flow of fluids into or out of the wellbore, and improves the efficiency of production by providing a conduit to deploy downhole

---

[2]      This approximate inventory cost is disclosed in the borrowing base certificate dated October 14, 2015 and is reflective of activity through October 11, 2015.

production equipment and tubing. KCS's crews, equipment and fleet of trucks operate out of two facilities, one in Colorado and the other in Pennsylvania. As of the Petition Date, KCS has approximately 60 full-time employees, including 1 insider.

11.     Sheffield owns real estate in Pennsylvania that includes office space and a warehouse that is rented by KCS to house its Pennsylvania operations. Sheffield has no employees.

## Capital Structure

### Stockholders' Equity

12.     The ownership units of A&B are held by one current employee, three former employees and a number of entities directly and indirectly affiliated with Ramex, Inc.

| Name | Description | Ownership % |
|------|-------------|-------------|
| James Spearman | Current Employee | 4.545455% |
| Andrew Cormier | Former Employee | 4.545455% |
| Jorge Diaz | Former Employee | 3.545455% |
| Phillip Kirk Arceneaux | Former Employee | 1.000000% |
| DBWII Trust | Affiliated with Ramex, Inc. | 14.250000% |
| DBWII Trust | Affiliated with Ramex, Inc. | 14.250000% |
| Rene Katz | Affiliated with Ramex, Inc. | 17.100000% |
| TMKII Trust | Affiliated with Ramex, Inc. | 5.700000% |
| NAKII Trust | Affiliated with Ramex, Inc. | 5.700000% |
| SEKII Trust | Affiliated with Ramex, Inc. | 9.500000% |
| LSKII Trust | Affiliated with Ramex, Inc. | 9.500000% |
| ECKII Trust | Affiliated with Ramex, Inc. | 9.500000% |
| Ramex Management, LLC | Affiliated with Ramex, Inc. | 0.863635% |
| Total | | 100.000000% |

### First Lien Notes

13.     A&B and KCS, as borrowers, are parties to that certain Revolving Credit, Term Loan and Security Agreement dated as of September 22, 2010 (as amended, supplemented, modified, or amended and restated from time to time, the "PNC Credit Agreement") by and between A&B and KCS, as borrowers, and PNC Bank, National Association ("PNC") as lender. The PNC Credit Agreement provides A&B with a senior secured asset-based revolving credit facility (the "PNC Revolving Facility") in the aggregate original principal amount of up to $17.5 million, subject to the terms and conditions set forth therein. The PNC Revolving Facility matures in 2016 and bears interest at a rate per annum equal to the sum of the Alternate Base Rate plus the Applicable Margin (as defined in the PNC Credit Agreement). The PNC Revolving Facility is subject to a borrowing base that consists of (a) 85% of eligible accounts receivable; plus (b) 85% of the appraised net orderly liquidation value of eligible inventory, and includes weekly reporting of borrowing base calculations monthly reporting of borrowing base calculations and unaudited financial statements, quarterly reporting of loan covenant calculations,

and annual reporting of excess cash flow recapture, audited financial statements, and projections. It further includes frequent onsite audits of accounts receivable and inventory and annual third party appraisals of inventory and equipment. As of the Petition Date, the balance of the PNC loan is approximately $6.5 million.

14.     The PNC Credit Agreement further provides KCS with a senior secured equipment related term facility (the "First PNC Equipment Term Facility") in the aggregate original principal amount of $5.0 million, subject to the terms and conditions set forth therein.  The First PNC Equipment Term Facility matures in 2016 and is payable in monthly fixed principal installments of $59,524 plus interest, with a variable interest rate per annum equal to the sum of the Alternate Base Rate plus the Applicable Margin (as defined in the PNC Revolving Credit Agreement).  The monthly payment reflects an amortization term of five (5) years.  As of the Petition Date, the balance of the First PNC Equipment Term Facility is approximately $1,251,870.

15.     By amendment to the PNC Credit Agreement dated April 18, 2012, PNC provided a second senior secured equipment related term facility (the "Second PNC Equipment Term Facility") in the aggregate principal amount of $3.0 million under which A&B gave a $3.0 million note dated April 18, 2012, subject to the terms and conditions set forth therein. The Second PNC Equipment Term Facility matures in 2018 and is payable in monthly fixed principal installments of $48,132 plus interest, with a variable interest rate per annum equal to the sum of the Alternate Base Rate plus the Applicable Margin (as defined in the PNC Revolving Credit Agreement).  As of the Petition Date, the balance of the Second PNC Equipment Term Facility is approximately $965,090.

16.     Sheffield and GP are guarantors of the PNC Credit Agreement.

17.     Sheffield is a party to that certain note by and between Sheffield and Community Bank (of Carmichaels, Pennsylvania), dated May 1, 2012, in the principal amount of $1,650,000, payable in monthly installments of $10,050, with an interest rate per annum of the weekly average of the five year federal home loan bank fixed rate plus 2.50%, minimum of 4.00%, and secured by real estate.  As the Petition Date, the balance of the Sheffield note is approximately $1,459,130.

Second Lien Notes

18.     KCS is a party to that certain note by and between KCS, as borrower, and 3K Partners, Ltd., as lender, dated September 22, 2010, payable in quarterly interest only installments at an interest rate of 8.25%, secured by the assets of A&B, and subordinate to PNC Credit Agreement.  As of the Petition Date, the balance of the 3K Partners' note is approximately $4,196,650.

Unsecured Notes

19.     KCS is a party to that certain note by and between KCS, as borrower, and Tyler E. Kimzey and Trisha Kimzey, as lenders, dated September 22, 2010, payable in quarterly interest

only installments at an interest rate per annum of 8.25%, which is purportedly secured by the ownership units in KCS, and subordinate to the PNC Credit Agreement. As of the Petition Date, the balance of the Kimzey note is approximately $4,128,460.

20. A&B is a party to that certain note by and between A&B, as borrower, and Ronald E. Wells, Inc., as lender, dated April 18, 2012, in the principal amount of $795,849.91, monthly interest payable with an interest rate of 8.00%, principal due in lump sum on March 31, 2020, unsecured, and subordinate to the PNC Credit Agreement. As of the Petition Date, the balance of the Wells note is approximately $808,000.

Trade Debt

21. As of the Petition Date, A&B has approximately $8.1 million in trade debt.

22. As of the Petition Date, KCS has approximately $50,000 in trade debt.

23. Sheffield and GP do not have trade debt.

## Events Leading to Chapter 11

24. These bankruptcy proceedings occur during a turbulent period in the oil and gas industry driven by a dramatic decline in oil prices exceeding 50 percent in one year as well as a significant drop in rig counts in key geographic regions where both A&B and Kimzey conduct business.[3]



---

[3]  Rig count information available at www.bakerhughes.com .

6



**Rigs by Region (Key Geographies for A&B Valve Business)**



**Rigs by Region (Key Geographies for Kimzey Business)**



The decline in oil prices and active rigs coupled with the liquidity that has been taken out of the market with respect to reserve based loans has forced key customers to cut overhead and capex budgets, thus negatively impacting the Debtors revenues. Prior to the drop in oil prices, the Debtors' consolidated revenues totaled approximately $93M in 2013 and 2014, respectively. Trailing 12 months revenue through August 2015 totaled approximately $68M, a 33% decrease from TTM August 2014. For the periods YTD August 2014 vs YTD August 2015, revenues were down 38%. Key customers addressed industry problems by delaying payments to the Debtors, the Debtors were forced to respond accordingly by delaying payments to their vendors. As industry uncertainty prompted customers to change their ordering patterns and delay projects, the Debtors' inventory levels rose. Similarly, cash strapped vendors began tightening credit

7

limits and terms with the Debtors as well. Dwindling revolver availability due to lowering advance rates compounded these working capital problems, causing the Debtors to be closer and closer to running out of liquidity each month. The Debtors believe that they would have run out of liquidity if they had not sought bankruptcy relief when they did.

25.     A&B's largest inventory problem is directly related to the bankruptcy of ATP Oil & Gas Corporation ("ATP") filed in August 2012 in the United States Bankruptcy Court for the Southern District of Texas. Prior to ATP's bankruptcy filing, A&B supplied specialized pipe, valves, fittings and other material to ATP's Octabuoy semi-submersible production platform and A&B carried a significant inventory to service ATP's needs. The Octabuoy project was suspended and ultimately discontinued following ATP's bankruptcy, rendering this inventory ineligible for the borrowing base. A&B currently holds $2.6 million of inventory (at cost) related to this project. Repeated efforts to sell this inventory have been unsuccessful, making alternative uses unlikely. There continues to be ongoing litigation related to A&B's purchase of products for the project.

26.     The Debtors attempted to negotiate with PNC to address these cash constraint issues and potentially avoid a bankruptcy filing. The Debtors requested that PNC increase the advance rate on eligible inventory towards prior levels or, to achieve a similar result, provide an "overadvance" on eligible inventory using current advance rates. Multiple conversations failed to produce a workable solution related to "overadvance" requests.

27.     The Debtors also sought an infusion of equity capital from their owners; however, the owners were unwilling to provide additional equity capital without a comprehensive balance sheet solution given the substantial amount of unsecured debt and pending litigation.

28.     Refinancing the Debtors was not feasible under current market conditions, particularly following unusually volatile commodity markets in January through August 2015. The price of WTI crude oil plunged to a 6 ½ year intraday low of $37.75 during the week of August 24, 2015 before rebounding almost 28 percent over the next three trading sessions and ultimately closing at $45.77 on September 4, 2015. At the Petition Date, WTI crude oil was approximately $46.00. According to industry expert Simmons & Co. International in its September 2015 report: "Continued supply increases from OPEC, resilient U.S. oil production, sustained non-OPEC, ex-U.S. supply growth so far in 2015 and concerns over softer economic data have contributed to an oversupplied market and a >30% pullback in crude prices since June to a new six-year low for WTI." Energy companies have been especially hard hit in the credit markets. Energy bonds in the JP Morgan High Yield Index fell -7.05 percent in August 2015 (versus -1.94 percent for the overall index), making energy the worst performing sector in the index. Seven of the ten worst performing high yield bonds in the index involved the energy sector. Financing alternatives for middle market companies in the energy sector have become even more tenuous.

29.     At the lenders' urging, the Debtors engaged Grant Thornton to analyze the current situation and provide strategic alternatives to the Debtors to help address liquidity concerns. Grant Thornton was previously engaged by the Debtors on or around August 11, 2014 at PNC's request to engage consultants to help management explore alternatives to cut costs, improve gross

margin and restructure the revolving credit facility that was, at the time, in technical default. As part of its initial engagement Grant Thornton identified a number of opportunities that included, but were not limited to:

    a.  implementing internal controls and inside sales staff training to help improve material margins,

    b.  identifying a profitability threshold for skus

    c.  shutting down distribution facilities,

    d.  ceasing operations in unprofitable store locations,

    e.  salary reductions and layoffs,

    f.  returning leased trucks,

    g.  renegotiating rent on leased facilities, and

    h.  subleasing vacant facilities.

Furthermore, Premium Casing Equipment, LLC ("Premium"), an affiliate of the owners, suspended or reduced charges related to equipment rented by KCS to alleviate the Debtors' cash flow issues. Though the Debtors made progress through its agreement with Premium and through certain recommendations made by Grant Thornton a year ago, the efforts have proved inadequate to counteract the liquidity strain brought on by the recent deterioration in sales and certain limits set forth in its revolving credit facility. Hence, Grant Thornton was engaged to provide both interim management and financial advisory services on September 3, 2015.

31.    On October 1, 2015, PNC issued a default letter to A&B and Kimzey citing the Material Adverse Effect clause of the Credit Agreement and noting that information provided by the Company requesting debtor-in-possession financing for the Company's proposed bankruptcy cases as a result of current and projected negative cash flow of the businesses constituted a default. As a result of PNC's notice of default, the Company was faced with three basic alternatives: (i) to institute bankruptcy cases for the Company, forego the Line of Credit and move for authority to use cash collateral without further advances by PNC under the Line of Credit which would not have worked because as of filing the Company would have had no cash, and incoming proceeds from collections would be insufficient to maintain operations; (ii) to institute bankruptcy and make an agreement with PNC for the right of the Company to use its cash collateral, maintain borrowing under the Line of Credit and require the Company to seek Court approval of bidding procedures for conducting an auction and liquidating the Company ("Alternative 2"); or (iii) wind-down the Company and liquidate the assets outside of bankruptcy. The Company chose Alternative 2 as being the least costly approach and the best method for preserving the possibility of identifying a stalking horse bidder(s), preserving the going concern value of the businesses, and preserving the prospect of obtaining through the bankruptcy process value for creditors other than PNC. The PNC financing agreement is currently under negotiation (hopefully to be concluded by end of the date of filing). If not, the Company will seek to obtain consummation of competing financing proposal.

## FIRST DAY RELIEF

32.    Following this Declaration, the Debtors intend to file a number of so called "First Day Motions" seeking orders granting various forms of relief. I have read and reviewed the

following First Day Motions (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information and belief:

a. *Emergency Motion for Order Under Bankruptcy Rule 1015(b) Directing Joint Administration of Chapter 11 Cases* (the "<u>Joint Administration Motion</u>");

b. *Debtor's Emergency Motion to Limit Notice* (the "<u>Notice Procedures Motion</u>")

c. *Motion For An Order (i) Approving Continued Use Of Cash Management System, (ii) Authorizing Use Of Pre-Petition Bank Accounts And Business Forms, And (iii) Waiving The Requirements Of 11 U.S.C. § 345(b)* (the "<u>Cash Management Motion</u>");

d. *Motion For Entry Of An Order To (A) To Pay All Outstanding Pre-Petition Wages, Salaries, Other Accrued Compensation, Expense Reimbursements, Benefits, And Related Amounts; And (B) Continue Specified Benefit Programs In The Ordinary Course Of Business* (the "<u>Employees Motion</u>");

e. *Motion For Entry Of An Order Authorizing (i) Payment of Certain Pre-Petition Taxes, and (ii) Financial Institutions to Process and Cash Related Checks and Transfers* (the "<u>Tax Motion</u>");

f. *Emergency Motion For An Order (I) Authorizing The Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 364(c) and 364(d), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. §363(c); (III) Granting Adequate Protection Pursuant to 11 U.S.C. §361; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* (the "<u>DIP Financing / Cash Collateral Motion</u>") [under negotiation as of filing];

g. *Application for Order Authorizing and Approving Kimzey Casing Service, LLC as Debtor-in-Possession Entering into Insurance Premium Finance Agreement* (the "<u>Kimzey Insurance Financing Motion</u>");

h. *Application for Order Authorizing and Approving A&B Valve and Piping Systems, L.L.C. as Debtor-in-Possession Entering into Insurance Premium Finance Agreement* (the "<u>A&B Insurance Financing Motion</u>");

i. *Motion for the Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "<u>Utilities Motion</u>");

j. *Motion for Entry of an Order Authorizing Payment of Compensation Commensurate With Pre-Petition Payments to Specified Insiders* (the "<u>Insiders Motion</u>");

k.  *Debtors' Application for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing (I) Debtors' Designation of Douglas J. Brickley as Manager and Chief Restructuring Officer and (II) Retention and Employment of The Claro Group, LLP, Nunc Pro Tunc to the Petition Date*;

l.  *Debtors' Application for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing (I) Debtors' Designation of Ryan A. Maupin as Interim Chief Executive Officer and (II) Retention and Employment of Grant Thornton, LLP, Nunc Pro Tunc to the Petition Date*;

m.  *Application To Employ Gordon, Arata, McCollam, Duplantis & Eagan, LLC As Attorneys For The Debtors*;

n.  *Motion for Administrative Order Under Bankruptcy Code Sections 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*; and

o.  *Debtors' Emergency Motion for an Order Granting Extension of Time for Filing Schedules and Statements of Financial Affairs* (the "<u>Schedules and Statements Motion</u>").

33.     I believe that the relief sought in each of the First Day Motions (a) is in the best interests of the estates and their creditors; (b) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses, or loss of productivity or value; and (c) constitutes a critical element in achieving the Company's successful reorganization and confirmation of a plan of reorganization. With specific comment to several of the First Day Motions, I note the following:

34.     **The Joint Administration Motion**. The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Cases will affect all Debtors. Under these circumstances, the Debtors believe that the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Cases for procedural purposes only. The Debtors further believe that joint administration of these Cases will ease the administrative burden on the Court by allowing these Cases to be administered as a single joint proceeding instead of those independent Cases. Joint administration of these Cases will also create a centralized location for the numerous documents that are likely to be filed and served in these Cases and for all notices and orders entered by the Court. A single docket will make it easier for all parties in both Cases to stay apprised of the various matters before the Court. The Debtors will also likely realize substantial cost savings and reduced administrative burdens by sending notices to a single matrix or master service list, as the case may be, rather than maintaining separate notice lists. For these reasons, the Debtors submit, and I believe, that it is in the best interest of the Debtors, their estates, and their creditors, and other parties in interest that the Court grant the relief requested in the Joint Administration Motion.

11

35.     **The Employees Motion**.  The Debtors seek to pay their Employees for work performed pre-petition, to honor other pre-petition Employee-related obligations and benefits, and to continue paying their Employee obligations in the ordinary course of the Company's businesses. In addition, the Debtors seek authorization for applicable banks to receive, process, honor, and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Company's payroll and/or general disbursement accounts, to the extent that such checks or transfers relate to any of the pre-petition employee obligations.

a.  The Debtors request the entry of an order pursuant to Bankruptcy Code §§ 105(a), 363(b), 507(a)(4), and 507(a)(5) (i) authorizing the Debtors, in accordance with their stated policies, to (a) pay all pre-petition employee wages, salaries, and other accrued compensation; (b) reimburse all pre-petition employee business expenses; (c) make all contributions to pre-petition benefit programs and continue such programs in the ordinary course of business; (d) honor workers' compensation obligations; (e) make all payments for which pre-petition payroll withholding deductions (including, but not limited to, payroll taxes) were made; (f) pay all processing costs and administrative expenses relating to the foregoing payment and contributions; and (g) make all payments to third parties incident to the foregoing payments and contributions; (ii) authorizing the Debtors to continue payment of wages, compensation, and employee benefit programs in the ordinary course of business and to pay other costs and expenses relating to the foregoing; and (iii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll and employee benefits accounts to make the foregoing payments.

b.  Pursuant to the Employees Motion, the Debtors are seeking authority to honor and pay all pre-petition employee wages, salaries and other accrued compensation, and to continue to honor certain other policies, programs and benefits the Debtors provides to their employees in the ordinary course of business.

c.  The Debtors have a current combined work force of approximately 136 employees, of which all are full-time Employees.  Of these Employees, the Debtors employ (i) approximately 71 hourly wage Employees (the "Hourly Wage Employees"), (ii) approximately 59 salaried Employees (the "Salaried Employees") and (iii) 6 are Insiders. The Employees possess the institutional knowledge, experience, and skills necessary to support a successful reorganization of the Debtors' business operations.  The uninterrupted continuation of the Debtors' businesses is critically dependent upon a ·stable work force.  I believe that any significant number of employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtors' businesses and result in immediate and irreparable harm to the estate and its creditors.  There is a real, immediate risk that if the Debtors are not authorized to continue to honor their pre-petition Employee Obligations in the ordinary course, the employees would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and instantly destroying the prospects of a successful reorganization.  The business of the

Debtors requires the workforce it has and is dependent upon its workers to maintain their work schedules. The employees simply cannot afford to be squeezed by the happenstance of a bankruptcy filing. Consequently, I strongly believe that it is critical that the Debtors be permitted to pay their employees their pre-petition wages, honor vacation and personal time off obligations, continue their workers' compensation and unemployment programs, maintain employee benefits, continue garnishment and payroll deductions, reimburse Employee's business expenses, and honor all miscellaneous Employee benefits that the Debtors have traditionally provided in the ordinary course of business (all such obligations to the Employees, collectively, the "Employee Obligations"). The Company's records indicate that, as of the Petition Date, no non-Insider Employee is owed pre-petition wages, salaries or other amounts in excess of $11,725.

36. **The Tax Motion**. The Debtors request the entry of an order authorizing the Debtors to remit and pay sales and use, income, franchise, property, and unemployment taxes, and business license and other similar fees.

    a. In the ordinary course of business, the Debtors: (a) incur and/or collect taxes, including franchise, sales, use, unemployment, and miscellaneous taxes in the operation of their businesses (collectively, the "Taxes"); (b) incur business license, permit, and vehicle fees and other similar assessments (collectively, the "Fees") in connection with obtaining licenses and permits necessary to operate their businesses; and (c) remit such Taxes and Fees to various taxing, licensing, and other governmental authorities (collectively, the "Authorities").

    b. The Debtors incur an assortment of sales, use, and miscellaneous similar taxes in connection with the operation of their facilities and the distribution of their products (the "Sales and Use Taxes"). Generally, sales taxes are remitted to the Authorities in the month or quarter following acquisition or transportation of the corresponding goods. I believe that the Debtors are timely with respect to Sales and Use Taxes; however, the Debtors reserve the right to pay, subject to Court approval, any Sales and Use Taxes that have accrued and are not yet paid, as of the Petition Date. The fact that certain Sales and Use Taxes may have accrued and are unpaid does not mean the Company is in default of their tax obligations. Any unpaid taxes are those which happen to fall within the pre-petition time due to the filing date as Sales and Use Taxes are collected and paid for the previous fiscal month not yet calculated and will be payable after the filing date. This payment will be an ordinary course of business payment. Also failure to pay could result in personal liability imposed upon officers and responsible parties, which the Debtors owe a duty to avoid.

    c. Federal and state Authorities impose unemployment taxes for employer-funded unemployment compensation programs. The Authorities calculate the unemployment taxes based upon various tax rates assessed against the amount of wages paid in those jurisdictions in which the Debtors operate. Often, state tax liability with respect to anyone employee is capped at a certain amount. The

Debtors estimate that, as of the Petition Date, approximately $44,500 of unemployment taxes have accrued and are unpaid.

d.  I believe that the Debtors' payment of Taxes and Fees in the ordinary course of business is justified because, among other things, certain of the Taxes and Fees are not property of the estate pursuant to Bankruptcy Code § 541(d).  In addition, it is my understanding that the Debtors' managers and officers may be held personally liable for the non-payment of certain taxes.  Thus, certain Authorities may take precipitous action against the Debtors' managers and officers for unpaid Taxes, which would distract the Debtors from their efforts to complete a successful reorganization and impose an unfair burden upon the Debtors' officers and responsible persons.

e.  Payment of the Taxes and Fees proposed likely will give the Authorities no more than that to which they otherwise would be entitled under a chapter 11 plan and will save the Debtors the potential interest expense, legal expense, and penalties that otherwise might accrue on the Taxes and Fees during this Case.  As well, the managers and officers will not be exposed to personal liability and the employees' tax situations will not be adversely affected.

f.  It is my opinion that the Debtors' payment of the Taxes and Fees proposed to be paid is an exercise of sound business judgment and is necessary to permit a successful reorganization.

37.  **The DIP Financing / Cash Collateral Motion** [under negotiation as of filing]. The Debtors are requesting a post-petition loan commitment in the form of the continuation and maintenance of their current senior secured asset-based revolving credit facility (the "Secured Credit Facility") with PNC Bank ("PNC") and to use cash which may constitute cash collateral of the Pre-Petition Lenders (as defined in the motion) on an interim basis for payment of minimum operating expenses.  As of the Petition Date, the Debtors possessed cash in its bank accounts (the "Cash Collateral") and the Debtors continue to collect payments from its customers in the ordinary course of business.  The Debtors have an immediate need for DIP financing and the use of Cash Collateral, including cash proceeds, to continue to operate their businesses.  Without those funds, the Debtors will not be able to make cash expenditures for necessary costs incurred during their reorganization, including but limited to, wages, salaries, rent, professional fees and other expenses that arise in the administration of the bankruptcy cases and in the ordinary course of the Debtors' businesses.  The Debtors require DIP financing and they have little to no unencumbered cash with which to operate their businesses – accordingly, if the Debtors are unable to enter into a DIP financing agreement with PNC use the Cash Collateral, the Debtors will seek to consummate an alternative financing proposal which would involve a priming dispute/fight which will be unavoidable if terms cannot be made with PNC (the current dispute, are narrow in scope).

a.  The summary of terms is contained within the DIP Financing / Cash Collateral Motion and the Debtors believe the terms to be reasonable under the circumstances – precipitous need for filing due to the current trends in the

14

industry and the Debtors' inability to identify any viable commercial financing options.

b. The DIP Financing / Cash Collateral Motion set will forth the legal basis for obtaining court approval and includes a request that the Debtors be authorized to use cash collateral and other collateral property in the operation of their businesses. The Company has prepared a budget forecast for the next ten (10) weeks, showing the needs for and uses of cash produced by operations, which is attached as an exhibit to the motion.

c. I believe that the Budget provides for the use of Cash Collateral in such a manner to prevent a decline in the value of the estate and the Cash Collateral. I further believe that the Cash Collateral that the Debtors propose to spend in the Budget will be in an amount necessary to prevent the Debtors from suffering "immediate and irreparable harm." I further believe that the Budget submitted to PNC provides in its current form a viable financial format for working forward toward an orderly sale of the Company and or its assets.

38. **The Utilities Motion**. The Debtors request the entry of interim and final orders pursuant to Bankruptcy Code § 366 (i) prohibiting utility companies from altering, refusing, or discontinuing utility services, (ii) deeming utility companies adequately assured of future performance, and (iii) establishing procedures for determining adequate assurance of payment.

a. In the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by approximately 39 utility providers. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is critical that utility services continue uninterrupted during these Cases.

b. I believe and am advised that the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance are necessary in these Cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these Cases. Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding – on or after the thirtieth (30th) day following the Petition Date – that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these Cases. The Debtors propose to leave prepetition deposits in place and to continue paying the bills of utilities in the ordinary course of business. While this will mean that certain prepetition bills

15

for utilities will be paid, the alternative is that utilities will apply deposits to prepetition amounts leaving the Debtors in the position of having to make new deposits. The effect, money wise, will be the same, but the alternative to the proposal of the debtors would be very disruptive.

c. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will enable the Debtors to continue to operate their businesses in chapter 11 without disruption, and will provide our numerous ability providers with assurance that their payments will not be interrupted and that no precipitous action need to be taken. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

39. **The Cash Management Motion [contingent upon agreement regarding the Cash Collateral/DIP Motion]**. As described herein and in detail in the Cash Management Motion, the Company, in the ordinary course of business, maintains an automated and integrated cash management and disbursement system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System").

a. The Company maintains current and accurate accounting records of daily cash transactions and submits that maintenance of the Cash Management System will prevent undue disruption to the Company's business operations while protecting the Company's cash for the benefit of these estates. It is critical that the Company be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their business operations. Substantially disrupting their current cash management procedures would impair the Company's operations and ability to optimize their business performance.

b. I understand that the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases, including the closure of prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks and businesses forms designated "debtor in possession." I believe that strict compliance with such requirements would cause significant and unnecessary disruption in the Company's businesses, thereby impairing their efforts to reorganize in a timely manner and pursue other alternatives to maximize the value of these estates.

c. The Debtors also request that the Court waive the requirements of Bankruptcy Code § 345(b) on an interim basis and permit them to maintain their deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtains this Court's approval to deviate from the guidelines imposed under Bankruptcy Code § 345(b) on a final basis.

d. I have been advised that PNC Bank is approved by the United States Trustee for Region 5 (the "U.S. Trustee") as an authorized depository ("Authorized Depository") and the Company's main bank accounts are maintained with PNC

16

Bank. Accordingly, any funds that are deposited in these Bank Accounts are secure, the Company is in compliance with Bankruptcy Code § 345, and the Company does not seek waiver of any of these requirements.

e. I believe that the relief requested in the Cash Management Motion is in the best interests of the Company's estates and creditors and is both necessary and appropriate to the efficient administration of this Case and the Company's reorganization efforts.

40. **Insurance Motion**. The Debtors also seek the entry of an order authorizing the Debtors to (a) continue insurance coverage currently in effect and pay any pre-petition amounts related thereto and (b) enter into insurance policies and financing agreements post-petition. The Debtors maintain active insurance policies that provide coverage for, among other things, general commercial liability, commercial automobile liability, motor freight cargo, commercial equipment liability, fiduciary liability, directors and officers liability, commercial excess liability (umbrella), contaminated products, excess liability, and workers' compensation liability, including any new or similar policies entered into by the Debtors due to expiration or otherwise (collectively, the "Insurance Policies"). I believe that continuation of the Insurance Policies during these Cases is essential to the preservation of the Debtors' businesses, property, and assets. Amounts necessary to finance the Insurance Policies' premium obligations have been included in the Budget. In light of the importance of maintaining insurance coverage with respect to the Debtors' business activities, I believe it is in the best interests of the Debtors' estates and all parties-in-interest to maintain the Insurance Policies pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. I believe that failure to pay premiums and related insurance expenses when due may harm the Debtors' estates in several ways. First, the Debtors' insurance companies may refuse to renew the Debtors' Insurance Policies, which will require the Debtors to obtain replacement policies and possibly to reconfigure their risk management program. This, in turn, would require the commitment of significant resources and could result in less favorable coverage or terms from the Debtors' insurers. Second, the Debtors' Insurance Carriers could attempt to terminate the Debtors' existing Insurance Policies, which could create uncertainty as to the Debtors' ability to continue operating their businesses given the myriad regulatory and contractual requirements imposed on the Debtors to maintain specific amounts and types of insurance coverage. Any purported termination of the Debtors' Insurance Policies and any material change in the terms thereof would place additional strain on the Debtors' management and employees, who benefit from the Debtors' insurance coverage.

41. **The Insiders Motion**. The Debtors request authorization to continue compensating Insiders commensurate with their pre-petition compensation. The Insiders hold key management and sales positions with the Debtors and are vital to the daily operation of the Debtors' businesses. The compensation sought for each Insider is equivalent to their pre-petition paid salaries and benefits. I believe all Insider compensation to be fair and reasonable.

42. **The Schedules and Statements Motion**. The Debtors request, pursuant to Bankruptcy Code § 521 and Bankruptcy Rule 1007, an extension of time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules"). Due to the size and complexity of the Debtors' operations, and the precipitous need for immediate filings, the Debtors have been unable to complete the drafting of Schedules and do not anticipate

having the Schedules ready for filing within the 14-day period prescribed by Bankruptcy Rule 1007(c). Therefore, the Debtors are requesting a 30-day extension of the applicable time period. It is my belief that no creditor will be harmed by the requested extension because the §341 meeting of creditors has not yet been scheduled. Accordingly, I submit that ample cause exists for the requested extension of time to file the Debtors' Schedules.

## **CONCLUSION**

43.     In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of this Case, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed on October 16, 2015 in Baton Rouge, Louisiana.

By:     */s/ Ryan A. Maupin*_____

Name: Ryan A. Maupin
Title:   Interim Chief Executive Officer

18