# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

|  |  |
|---|---|
| IN RE:<br><br>A&B VALVE AND PIPING SYSTEMS, L.L.C., *et al.*,<br><br>　　　　DEBTORS | CASE NO. 15-51336<br><br>(JOINT ADMINISTRATION REQUESTED)[1]<br><br>CHAPTER 11<br><br>CHIEF JUDGE ROBERT SUMMERHAYS |

## EMERGENCY MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 364(c) AND 364(d), (II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c); (III) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 361; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

**NOW INTO COURT**, through undersigned counsel, come the debtors-in-possession, A&B Valve and Piping Systems, L.L.C.; Kimzey Casing Service, LLC; Sheffield GP, LLC; and Sheffield Holdings, LP (collectively, the "Debtors" or "Company") who hereby move (this "Motion") this Court for entry of interim and final orders pursuant to sections 361, 362 and 364 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., as amended, the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i) authorizing the Debtors to obtain post-petition financing; (ii) authorizing the Debtors to use cash collateral on the terms and conditions set forth herein; (iii) granting adequate protection; (iv) scheduling and approving the method of notice of the final hearing on the Motion (the "Final

---

[1]　　The Debtors have concurrently filed a Motion for Order Under Bankruptcy Rule 1015(b) Directing Joint Administration of Chapter 11 Cases seeking the joint administration of the cases of Kimzey Casing Service, LLC (15-51337); Sheffield Holdings, LLC (15-51338); and Sheffield GP, LP (15-51339) with A&B Valve and Piping Systems, LLC (15-51336).

2333943

Hearing"); and (v) providing related relief. In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND PROCEDURAL BACKGROUND

1.       This Court as jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory and legal predicates for the relief requested herein are sections 361, 362 and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 6004.

4.       On October 16, 2015 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing these cases (the "Cases").

5.       Since the Petition Date, the Debtors have continued to operate and manage its businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

6.       As of the date of this Motion, no official committee of unsecured creditors has been appointed.

## STATEMENT OF FACTS

**A.**     **Business Overview**

7.       A&B Valve and Piping Systems, L.L.C. ("A&B") is a Louisiana limited liability company engaged in the business of stocking and distributing pipes, valves, fittings, flanges, fasteners, and general oilfield supplies primarily in Louisiana and Texas. A&B was formed in 2009 and shortly thereafter merged with A&B Valve and Piping Systems, LP, a Texas limited partnership (the "A&B Predecessor"). A&B maintains its principal office in Broussard, Louisiana, and is the ultimate parent entity of the Company, as illustrated below:

2333943



8.      A&B is an operating and holding company. The business operations of A&B are primarily stocking and distributing a broad array of products consisting primarily of pipes, valves, fittings, flanges, fasteners, and general oilfield supplies to the upstream and midstream oil and gas industries. A&B operates six (6) leased warehouse facilities in Louisiana and Texas, with each maintaining a unique product inventory with thousands of items. A&B sources its products from hundreds of manufacturers and distributors. Nearly all of A&B's business involves work on an order-by-order basis without long-term contractual commitments by customers. Such orders typically involve multiple items, some of which A&B has in inventory and others that must be sourced from third parties. Due to the long lead-time for sourcing certain items, A&B historically purchases these inventory items in anticipation of customer orders and upcoming projects. A&B's aggregate inventory at cost is approximately $13.1 million.[2] A&B maintains its own fleet of 116 trucks and trailers and also uses third party logistics providers to deliver products to its customers. As of the Petition Date, A&B has approximately 73 full-time employees, including 5 insiders.

9.      Kimzey Casing Service, LLC ("KCS") is a Texas limited liability company that is 100 percent owned by A&B. KCS is engaged in the business of providing casing running

---

[2]      This approximate inventory cost is disclosed in the borrowing base certificate dated October 14, 2015 and is reflective of activity through October 11, 2015.

2333943

services for oil and gas drilling primarily in Colorado, Pennsylvania and West Virginia.  KCS was formed by the A&B Predecessor in 2007 and has its headquarters in Denver, Colorado.

10.      KCS employs specialized crews and heavy trucks and equipment to provide casing installation services for oil and gas wells.  Well casing consists of a series of steel pipes that are installed in all oil and gas wells after they have been drilled.  Casing prevents the walls of the wellbore from caving in, prevents the uncontrolled flow of fluids into or out of the wellbore, and improves the efficiency of production by providing a conduit to deploy downhole production equipment and tubing.  KCS's crews, equipment and fleet of trucks operate out of two facilities, one in Colorado and the other in Pennsylvania.  As of the Petition Date, KCS has approximately 60 full-time employees, including 1 insider.

11.      Sheffield Holdings, L.P. ("Sheffield") is a Pennsylvania limited partnership formed in 2012 to acquire real estate in Washington County, Pennsylvania.  Sheffield is 99 percent owned by A&B and 1 percent owned by Sheffield GP, LLC ("GP"), a Pennsylvania limited liability company formed in 2012.  GP is 100 percent owned by A&B.  The real estate owned by Sheffield is rented to KCS. Sheffield has no employees.

**B.      Secured Financing Loan Structure**

12.      A&B and KCS, as borrowers, are parties to that certain Revolving Credit, Term Loan and Security Agreement dated as of September 22, 2010 (as amended, supplemented, modified, or amended and restated from time to time, the "Credit Agreement") by and between A&B and KCS, as borrowers, and PNC Bank, National Association ("PNC") as lender.

13.      The Credit Agreement provides (i) A&B with a senior secured asset-based revolving credit facility (the "Revolving Credit Facility"), (ii) KCS with a first senior equipment

2333943

term loan facility ("First Equipment Term Facility"), and (iii) KCS with a second senior equipment term loan facility ("Second Equipment Term Facility").

14.     Under its terms the Revolving Credit Facility provided revolving line of credit availability of up to $17.5 million, subject to the terms and conditions set forth therein. The Revolving Credit Facility matures in 2016, and bears interest at a rate per annum equal to the sum of the Alternate Base Rate plus the Applicable Margin (as defined in the Credit Agreement). The Revolving Credit Facility is subject to a borrowing base that consists of (a) 85% of eligible accounts receivable; plus (b) 85% of the appraised net orderly liquidation value of eligible inventory, and includes weekly reporting of borrowing base calculations monthly reporting of borrowing base calculations and unaudited financial statements, quarterly reporting of loan covenant calculations, and annual reporting of excess cash flow recapture, audited financial statements, and projections. It further includes frequent onsite audits of accounts receivable and inventory and annual third party appraisals of inventory and equipment. Prior to the commencement of these Cases, PNC issued a default notice and A&B has only been able to access advances under the Revolving Credit Facility on a specific request basis since receiving such notice.

15.     The First Equipment Term Facility is represented by a note in the initial aggregate principal amount of $5.0 million, subject to the terms and conditions set forth therein. The First Equipment Term Facility matures in 2016 and is payable in monthly fixed principal installments of $59,524 plus interest, with a variable interest rate per annum equal to the sum of the Alternate Base Rate plus the Applicable Margin (as defined in the Credit Agreement).

16.     The Second Equipment Term Facility is represented by a note in the initial aggregate principal amount of $3.0 million subject to the terms and conditions set forth therein.

2333943

The Second Equipment Term Facility matures in 2018 and is payable in monthly fixed principal installments of $48,132 plus interest, with a variable interest rate per annum equal to the sum of the Alternate Base Rate plus the Applicable Margin (as defined in the Credit Agreement).

17.     Sheffield and GP are guarantors of the Credit Agreement.

18.     The Revolving Credit Facility, First Equipment Term Facility and Second Equipment Term Facility are secured by liens (the "PNC Pre-Petition Lender Lien") on substantially all of the assets of the Company (the "Pre-Petition Collateral"), as well as by the Sheffield and GP guaranties (the "Pre-Petition Guaranties").  As of the Petition Date, the principal amount outstanding under the Revolving Credit Facility was approximately $6.5 million, under the First Equipment Term Facility was approximately $1.25 million and under the Second Equipment Term Facility was approximately $965,000.

19.     Sheffield is a party to that certain note by and between Sheffield and Community Bank (of Carmichaels, Pennsylvania), dated May 1, 2012, in the principal amount of $1,650,000, payable in monthly installments of $10,050, with an interest rate per annum of the weekly average of the five year federal home loan bank fixed rate plus 2.50%, minimum of 4.00%, and secured by real estate.  As the Petition Date, the balance of the Sheffield note is approximately $1.46 million.

20.     KCS is a party to that certain note by and between KCS, as borrower, and 3K Partners, Ltd. ("3K Partners"), as lender, dated September 22, 2010, payable in quarterly interest only installments at an interest rate of 8.25%, secured by a lien subordinate to the PNC Pre-Petition Lender Lien, in, to and upon certain of the assets of A&B.  As of the Petition Date, the principal balance of the 3K Partners' note is approximately $4.2 million.

2333943

21.     The Company has financing with other purchase money lending parties, involving vehicle and equipment purchases and/or financed leases of computer and other equipment.

22.     **Nothing in this Motion or within the relief requested is intended to affect the loans, security interests, lien positions or rights of PNC, Community Bank, 3K Partners, or other third party lender/loan/financing parties.**[3]

## C.     Events Leading to Bankruptcy

23.     These bankruptcy proceedings occur during a turbulent period in the oil and gas industry driven by a dramatic decline in oil prices exceeding 50 percent in one year as well as a significant drop in rig counts in key geographic regions where both A&B and Kimzey conduct business.  The recent decline in oil prices and active drilling rig counts coupled with the liquidity that has been taken out of the market with respect to reserve based loans has forced key customers to cut overhead and capex budgets, thus negatively impacting the Company's revenues.  Prior to the drop in oil prices, the Company's consolidated revenues totaled approximately $93M in 2013 and 2014, respectively. Trailing 12 months revenue through August 2015 totaled approximately $68M, a 33% decrease from TTM August 2014.  For the periods YTD August 2014 vs YTD August 2015, revenues were down another 38%.  Key customers addressed industry problems by delaying payments to the Company, and the Company was forced to respond accordingly by delaying payments to their vendors.  As industry uncertainty prompted customers to change their ordering patterns and delay projects, the Company's inventory levels rose.  Similarly, cash strapped vendors began tightening credit limits

---

[3]     Attached hereto as **EXHIBIT A** is a summary of the UCC-1 Financing Statements and Mortgages that undersigned counsel has been able to obtain through searches of mortgage records and central directory searches of the Secretary of State offices in the Louisiana, Texas and Pennsylvania.  This listing is not meant to be a statement of the position of the Company as to the complete listing of the recorded security interest documents, but a recitation of what counsel has found regarding recorded financing statements and mortgage interests.

and terms with the Company as well. Dwindling revolver availability due to lowering advance rates compounded these working capital problems, causing the Company to be closer and closer to running out of liquidity each month. The Debtors in fact had run out of liquidity as of the filing of the Cases, and obtained authorization to make a draw on or about October 16, 2015 to allow the Company to make payroll (after receipt of the default notice from PNC).

24.     A&B's largest inventory problem relates to the bankruptcy of ATP Oil & Gas Corporation ("ATP") filed in August 2012. A&B supplied specialized pipe, valves, fittings and other material to ATP's Octabuoy semi-submersible production platform. This project was suspended and ultimately discontinued following ATP's bankruptcy, rendering A&B's inventory held for ATP ineligible for the PNC borrowing base. A&B currently holds $2.6 million (cost) of inventory related to this project. Repeated efforts to sell this inventory have been unsuccessful, and given its specialty features alternative uses could be unlikely. There continues to be ongoing litigation related to A&B's purchase of products for the ATP project.

25.     The Company attempted to negotiate with PNC to ease the cash constraint issues and potentially avoid a bankruptcy filing. The Company believed that if PNC increased the advance rate on eligible inventory to be consistent with prior levels or alternatively would agree to provide an "overadvance" on eligible inventory using current advance rates, the Company may have be able to survive the industry downturn. These conversations failed to produce a workable solution.

26.     The Company also sought an infusion of equity capital from their owners. The owners were unwilling to provide additional equity capital without a comprehensive balance sheet solution given the substantial amount of secured and unsecured debt and pending litigation. This is understandable.

2333943

27.     Refinancing the Company was also not feasible under current market conditions, particularly following unusually volatile commodity markets in July and August 2015.  The price of WTI crude oil plunged to a 6 ½ year intraday low of $37.75 during the week of August 24, 2015 before rebounding almost 28 percent over the next three trading sessions and ultimately closing at $45.77 on September 4, 2015.  According to industry expert Simmons & Co. International in its September 2015 report:  "Continued supply increases from OPEC, resilient U.S. oil production, sustained non-OPEC, ex-U.S. supply growth so far in 2015 and concerns over softer economic data have contributed to an oversupplied market and a >30% pullback in crude prices since June to a new six-year low for WTI." Energy companies have been especially hard hit in the credit markets.  Energy bonds in the JP Morgan High Yield Index fell -7.05 percent in August 2015 (versus -1.94 percent for the overall index), making energy the worst performing sector in the index.  Seven of the ten worst performing high yield bonds in the index involved the energy sector.  Financing alternatives for middle market companies in the energy sector have become even more tenuous.

28.     On October 1, 2015, PNC issued a default letter to A&B and KCS citing the Material Adverse Effect clause of the Credit Agreement and noting that information provided by the Company requesting debtor-in-possession financing for the Company's proposed bankruptcy cases as a result of current and projected negative cash flow of the businesses constituted a default.

29.     As a result of PNC's notice of default, the Company was faced with three basic alternatives:  (i) to institute bankruptcy cases for the Company, forego the Line of Credit and move for authority to use cash collateral without further advances by PNC under the Line of Credit which would not have worked because as of filing the Company would have had no cash,

2333943

and incoming proceeds from collections would be insufficient to maintain operations; (ii) to institute bankruptcy and make an agreement with PNC for the right of the Company to use its cash collateral, maintain borrowing under the Line of Credit (or obtain another priming post-petition secured lien form of financing under section 364(d)), and have the Company seek Court approval of bidding procedures for conducting an auction and liquidating the Company ("Alternative 2"); (iii) wind-down the Company and liquidate the assets outside of bankruptcy through foreclosure; or (iv) liquidate the Company through chapter 7 cases. The Company chose Alternative 2 as being the most likely to preserve the possibility of identifying a stalking horse or other bidder(s) for the company or its components on a going concern basis, so as to preserve the going concern value of the businesses and Company operating components, and preserve the prospect of obtaining through the bankruptcy process value for creditors other than PNC.

30.    While the Company obtained the possibility of an alternative source of funding through a third party term sheet, Court approval of the alternative source would have required a set of findings under Section 364(d) that the post-petition financing would be secured by a priming post-petition lien upon the Pre-Petition Collateral and all post-petition generated assets/collateral, but that notwithstanding the priming loan, the interests of PNC could be protected. This "priming fight" could have been very costly, and obtaining priming liens under Section 364 is very difficult.

31.    As a condition to the Debtors' access to and use of cash collateral and obtaining the financing requested herein, the Company and PNC have agreed to comply with the following milestones (the "Milestones"): (i) within five (5) days after the Petition Date or such later date on which the DIP Agent consents in writing in its sole discretion, the Debtors shall file a motion with the Bankruptcy Court requesting entry of an order (the "Sale Procedures Order") approving

2333943

the bidding procedures and auction process to be employed for the 363 Sale and providing for the DIP Agent's and PNC's right to "credit bid" for all or any portion of the assets; (ii) on or before the date that is thirty (30) days after the Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedures Order; (iii) on or before December 9, 2015, or such later date to which the DIP Agent consents in writing in its sole discretion, the Debtors shall have held an auction in connection with the 363 Sale and in accordance with the provisions set forth in the Sale Procedures Order; (iv) on or before December 16, 2015, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the order (the "<u>Sale Order</u>") in form and substance satisfactory to the DIP Agent that, among other things, approves the 363 Sale; and (v) on or before December 18, 2015, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Agent consents in writing in its sole discretion, the 363 Sale shall have closed, with the proceeds of the 363 Sale paid directly to the DIP Agent to be applied to the obligations under the Revolving Credit Facility, and as applicable, the First and Second Equipment Term Loan Facilities.

32.     The Company believes that the Milestones will expedite a sale process that is necessary, limit any loss of collateral value, and allow the Company to continue operating as a going concern for the benefit of these estates and all interested parties through the sale process. To satisfy these Milestones, access to cash collateral and the post-petition financing for which approval is requested herein is necessary and critical over the next 60-days.

## RELIEF REQUESTED

**A.     The Debtors' Immediate Need for Post-Petition Financing and Use Cash Collateral**

33.     The Debtors seek authority to maintain and continue the current Revolving Credit

2333943

Facility[4] with PNC, and the authority to use its cash collateral within the confines and workings of the Revolving Credit Facility. Without the use of Cash Collateral and the funds to be obtained under the Revolving Credit Facility, the Debtors lack sufficient liquidity to meet ongoing obligations and will be unable to continue operations throughout these Cases. Any interruption in the Debtors' business operations would be devastating and would likely result in their inability to continue as a going concern and a consequent loss of significant value with respect to estate assets. As part of the consideration for agreeing to the use of cash collateral and continued availability under the Revolving Credit Facility as a post-petition facility, the Debtors have consented that all Obligations under the Credit Agreement will become rolled up into a post-petition facility described below, which will convert the pre-petition outstanding balances on the notes issued under the Credit Agreement to become post-petition loans. The other terms that might be of most interest to creditors and parties in interest are set forth below.

34.     Use of the Revolving Credit Facility prior to the commencement of this Case operated generally as follows: The Company operates using a series of lockboxes and collection accounts handled by PNC. PNC receives and deposits all lockbox receipts into designated collection accounts maintained by A&B and KCS and all funds received in the respective collection accounts are automatically swept by PNC to repay the line of credit ("Line of Credit") under the Revolving Credit Facility. To fund its cash needs for operations, A&B and KCS also maintain separate disbursement accounts at PNC. Daily funding needs are determined by reviewing the cash needs of both A&B and KCS, and matching the cash needs against the availability under the loan availability formula. Post-petition the loan availability will be

---

[4]     For ease of understanding and continuity the "DIP facility" and "DIP financing" being requested herein will be referred to by the pre-petition reference as the Revolving Credit Facility, and as set forth below, with respect to the post-petition references as the Post-Petition Revolving Credit Facility.

2333943

determined the same way, but in accordance with the amended Credit Agreement and the cash collateral budget described below. Draws are made on the Revolving Credit Facility by means of deposits made into the A&B and KCS disbursement accounts, on which checks are issued. Amounts drawn against these disbursement accounts result in daylight overdrafts which are funded by a drawdown request to PNC from the Line of Credit. A&B's and KCS' funding requests are combined for purposes of issuing a single Line of Credit drawdown request to PNC. Once approved, PNC funds the advance request by transferring funds into A&B's disbursement account. The KCS disbursement account is automatically funded by drawing funds from the A&B disbursement account. The cash management system is more fully described within the *Motion For An Order (I) Approving Continued Use Of Cash Management System, (Ii) Authorizing Use Of Pre-Petition Bank Accounts And Business Forms, And (Iii) Waiving The Requirements Of Bankruptcy Code § 345(B)* (the "Cash Management Motion"). As set forth within the Cash Management Motion, the Company uses its cash to fund operations out of the Company operating accounts. As discussed in the Cash Management Motion the transfers to and from A&B and KCS are accounted for through due to/due from entries on the books of the Companies.

35. Because the Line of Credit portion of the Revolving Credit Facility employs the sweep mechanism, the right to use cash collateral and the authority to maintain financing under the Line of Credit are mutually dependent, as described herein and in the Cash Management Motion. The Company therefore requires both the authority to use its cash collateral and the authority to obtain/continue financing under the Line of Credit to meet cash needs. The Line of Credit is particularly useful, if not necessary, to allow the Company to fund the purchases of inventory to be able to meet customer demands and existing project requirements. The ability to

2333943

draw upon the Line of Credit allows the Company to maintain its vendor relationships, including certain favorable credit terms, and affords it the ability to maintain its competitive position within the industry, which translates directly to the value of the businesses. As was the case pre-petition, the Company intends to use its cash collateral and the proceeds of the Revolving Credit Facility to fund the payment of operating expenses incurred on and after the Petition Date (and pursuant to other motions which may be filed to fund certain critical pre-petition amounts due (to avoid, for example, losing suppliers, and possibly section 503(b)(9) claims)).

36. The Company requires immediate access to the Revolving Credit Facility and use of its cash collateral to assure continuity of its business operations. Further, the Company submits that the use of its business judgment in choosing Alternative 2 should be approved by the Court as the most advantageous and least adversarial method of proceeding, though the company realizes that approval of sale procedures will come, if it does, through approval of a separate motion.

**B. The Debtors' Seek Authority to Obtain Post-Petition Financing**

37. The Company has determined in the exercise of its sound business judgment that it needs and should maintain the Revolving Credit Facility as a post-petition Revolving Credit Facility (referred to herein as the "Post-Petition Revolving Credit Facility"). Given the indisputable need for post-petition financing and the need to seek immediate relief under the Bankruptcy Code in order to protect the going concern value of the Company's businesses and assets, the Company, as noted, approached PNC to discuss continuing the Revolving Credit Facility as post-petition financing, via Alternative 2. Following good faith negotiations, the Company has reached an agreement with PNC regarding maintenance of the Revolving Credit Facility on agreed terms (as set forth herein) and extending it to be effective as a post-petition

2333943

facility (the "Post-Petition Revolving Credit Facility") in accordance with and subject to the agreements set forth herein and that certain Term Sheet (the "DIP Term Sheet") substantially in the form attached hereto and incorporated herein as **EXHIBIT B** and within the amended credit agreement to be executed on an interim basis if the Court approves the interim relief requested herein, which will become final and executory upon final approval if granted by the Court. Additionally, the Company has agreed to an amended credit agreement reflecting the terms of the DIP Term Sheet and providing a legally enforceable contract ("Amended Credit Agreement"). The size of the Amended Credit Agreement document would make attachment as an exhibit at this stage cost prohibitive, but undersigned counsel will transmit copies via e-mail or mail (at Company expense) to any party in interest who requests (and the notice shall so state), and will as well provide a certificate of service that shows service of a redline version (redlined against the Credit Agreement) has been sent to the Office of the United States Trustee, counsel for PNC, counsel for 3-K Partners, prior to the requested emergency hearing.

38.     The Company believes that the Post-Petition Revolving Credit Facility represents the best source of post-petition financing available to it at this time. As discussed herein, the Company considered and pursued alternative debtor-in-possession financing and pre-petition stalking horse bidders. While these discussions presented certain alternatives as regards financing, the Company believes that Alternative 2 is the best opportunity to preserve the going concern value of the businesses and seek an organized liquidation, recognizing the secured position of PNC and the willingness of PNC to allow the Company to maintain the Line of Credit subject to, among other things, the Bankruptcy Court approving and entering a Sales Procedures Order within thirty (30) days of the Petition Date and an auction of the businesses occurring no later than December 9, 2015. Without access to the Post-Petition Revolving Credit

Facility, the Company would be unable to continue business operations in its present capacity which could jeopardize its going concern value.

39.     As mentioned, and of importance to parties in interest and the Court, the consideration of the financing to be provided includes, first, a "creeping roll up" and second, a full "roll up" of the pre-petition debt owed to PNC into post-petition debt under the Amended Credit Agreement, upon final approval of the financing and use of cash collateral.  The effect of the full "roll up" is that all pre-petition debt to PNC will be converted to post-petition debt under the Amended Credit Agreement, as though all amounts due as of the petition date had been lent post-petition.  The Company points out this feature, as the effect will be to convert some $8 million in pre-petition debt to a like amount of post-petition debt as part of the consideration of granting a post-petition revolving operating loan with availability of approximately $1.5 million.

40.     Further, collateral for the Amended Credit Agreement ("Post-Petition Collateral") will include all bankruptcy-related causes of action and any recovery thereon, including but not limited to all causes of action under Chapter 5 of the Bankruptcy Code, including, but not limited to, Section 506(c), Sections 544 through 550, and Section 553 or other applicable law, all to secure what as of final approval will be a post-petition loan of the entirety of amounts due under the Credit Agreement and any additional amounts lent post-petition under the Amended Credit Agreement.

41.     The Company represents that PNC is and will be adequately protected with respect to the Revolving Credit Facility by the Pre-Petition Collateral and the Post-Petition collateral and by the agreements herein and within this Motion whereby PNC will maintain all Pre-Petition Lender Liens and the Company shall grant PNC replacement liens and maintenance of and lien rights on post-petition generated property that would otherwise be defined as Pre-

Petition Collateral under the Revolving Credit Facility. Therefore, as an initial matter, adequate protection provided herein will, along with the proposed Post-Petition Revolving Credit Facility, provide PNC with adequate protection of its Pre-Petition Lender Lien upon the Pre-Petition Collateral. Accordingly, the Company has met the requirements of Bankruptcy Code § 364(d). Further, the subordinate lien position of 3-K Partners will remain adequately protected. Without the financing requested herein, it is likely that the assets of the Company would have to be liquidated either outside of bankruptcy through foreclosure or through a chapter 7 case. Either alternative, the company believes, would cause a precipitous decline in the value of the asstes and operations, which would hurt the value of the subordinate lien on the assets of A&B securing the 3-K Partners' loan to KCS. 3-K Partners shall as well obtain a subordinate replacement lien to the extent necessary, in, to and upon all collateral of the kind securing the pre-petition indebtedness of KCS to 3-K Partners, which shall be subordinate to the Pre-Petition Lender Lien and the post-petition liens securing the Amended Credit Agreement.

42. Under the Post-Petition Revolving Credit Facility proposed herein, (i) the Company will maintain the current sweep account structure, (ii) funding of cash will be permitted through the current Line of Credit, (iii) the funding under the Line of Credit post-petition will be secured by any and all post-petition generated property that would fall into the definition/description of collateral under the Revolving Credit Facility, (iv) the current system of due to/due from accounting entries will be used to maintain the accurate balances among the entities, (v) PNC will be authorized to apply the swept funds to the outstanding Line of Credit balance on a daily basis, including the amount due as of the commencement of these Cases, thereby creating more availability under the Line of Credit, (vi) neither this Motion nor the order approving this Motion (on interim or final basis) will affect the liability of any guarantor under

2333943

any guaranty agreement, and (vii) all reporting and other requirements under the Revolving Credit Facility will be maintained.

43.     Further, PNC shall be granted a first priority lien and security interest in, to and upon any accounts, work-in-progress, inventory or other collateral as described within and/or granted under the Revolving Credit Facility that might be generated post-petition and also shall obtain liens in, to and upon all bankruptcy-related causes of action and any recovery thereon, including but not limited to all causes of action under Chapter 5 of the United States Bankruptcy Code, including, but not limited to, Section 506(c), Sections 544 through 550, and Section 553 or other applicable law, and as well any and all commercial tort actions not specifically made part of the Pre-Petition collateral, with all such post-petition property to be deemed "Post-Petition Collateral" subject to the Post-Petition Lien under and securing the Amended Credit Agreement and al loans thereunder, including without limitation the Post-Petition Revolving Facility and the two Senior Secured Equipment Term Loans.  Any extensions of credit under the Post-Petition Revolving Credit Facility (and any of the Obligations under the Amended Credit Agreement) shall be secured by both the Pre-Petition Collateral and the Post-Petition Collateral, without the necessity of any further collateral or security filings by PNC, with all filings creating the Pre-Petition Liens to constitute perfection of the Post-Petition Liens in, to and upon the Pre and Post-Petition Collateral.

44.     PNC has agreed that any party in interest with standing to commence a contested matter or adversary proceeding to object to or challenge the validity of the Credit Agreement and the Pre-Petition Liens by the later of (i) five (5) days following entry of the Final Order and (ii) thirty (30) days following the retention of counsel, if any, by any official committee (the

2333943

"Challenge Period"*)*.  Absent any timely objection, the lien finding shall automatically be final at the end of the Challenge Period.

45.      PNC has also demanded and shall be granted a super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code to the extent provided by Section 507(b) of the Bankruptcy Code.

46.      The Company and PNC agree that the term of the Line of Credit under the Post-Petition Revolving Credit Facility, and also the maturity of the Amended Credit Agreement shall be the earliest to occur of the following dates: (a) the closing date of the sale of all or substantially all of the assets of the Company pursuant to Section 363(b), (d) and (f) of the Bankruptcy Code (the "363 Sale"); (b) December 31, 2015; or (c) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations under the Amended Credit Agreement or otherwise acceptable to PNC as DIP Agent.   Additionally, the Amended Credit Agreement (including the Revolving Credit Facility and the Post-Petition Revolving Credit Facility) termination events shall include (i) the appointment of a trustee in these Cases, (ii) the dismissal or conversion of these Cases, (iii) the entry of an order by the Bankruptcy Court granting relief from the automatic stay permitting foreclosure of any assets of the Company with a value in excess of $100,000, and (iv) the making of any Company proposal to the Bankruptcy Court for the sale of all or substantially all of any of their respective assets not approved by PNC.

**C.      The Debtors' Seek Authority to Use Cash Collateral**

47.      The Company seeks (a) authorization to use its cash collateral in accordance with the terms and conditions set forth herein and in accordance with the proposed 13-Week budget (the "Budget") a copy of which is attached hereto as **EXHIBIT C**, which is also the budget that

2333943

governs and projects availability under the Post-Petition Revolving Credit Facility; (b) authority to use Cash Collateral on a final basis in accordance with the proposed Budget and Final Order; and (c) granting of adequate protection to PNC as regards the Pre-Petition Collateral pursuant to Bankruptcy Code §§ 361 and 363(c), as described herein, to the extent that PNC held the Pre-Petition Lender Liens on the Pre-Petition Collateral, including without limitation cash collateral or the proceeds of collateral that would be cash collateral.

48.     As noted, the Company has an immediate need to use cash collateral, including cash proceeds, to continue the operation of its business and to preserve the value of the business as a going concern.  Without such funds, the Company will not be able to pay costs and expenses, including, but not limited to, wages, salaries, rent, professional fees, and general and administrative operating expenses that arise in the administration of these Case and in the ordinary course of the Company's businesses.

49.     The Company must be able to use cash collateral to continue its business operations on an uninterrupted basis.   The Company requests interim authorization to use cash collateral in accordance with the terms and conditions set forth herein and in accordance with the proposed Budget until a final order granting further use of cash collateral can be entered.   The Company is without sufficient funds to operate for fourteen or more days until a final hearing on this Motion can be held.  The Company's inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to the Company.  Because the Company's request for interim authorization seeks the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the value of their assets pending a final hearing, their request complies with Bankruptcy Rules 4001(b)(2) and 6003.

2333943

50. The Budget itemizes the sources and uses of cash and provides a projection of cash receipts and expenditures. The Budget includes business expenses that are reasonable and necessary and that must be paid in order to continue the Company's businesses until such time as a final hearing on the Motion can be held. The Budget shall not vary by more than fifteen percent (15%) for each week during any Budget period or more than ten percent (10%) on a cumulative basis for that portion of the Budget period then ended. The Company proposes that any amounts listed in the Budget that are unused in any month may be carried over and used by the Company in any subsequent month.

51. Therefore, the Company seeks entry of an order pursuant to Bankruptcy Code Sections 361 and 363 and Bankruptcy Rule 4001(b) (a) authorizing the Company to use cash collateral to pay overhead, operating expenses, and ordinary course obligations necessary to maintain and preserve the going-concern value of the Company's assets and business, and to administer the estates, including, but not limited to, using cash collateral to pay (i) any prepetition operating and other expenses approved by the Court, (ii) the post-petition operations of the Company's businesses, and (iii) all costs and expenses arising in connection with the administration of these estates, and (b) granting adequate protection to PNC.

## AUTHORITY

### A. The Post-Petition Revolving Credit Facility Should be Authorized

52. Approval of the Post-Petition Revolving Credit Facility and Amended Credit Agreement terms will provide the Company with immediate and ongoing access to borrowing availability to pay its current and ongoing operating expenses, including post-petition salaries and utility and vendor costs. Unless these expenditures are made, the Company will be forced to cease operations, which could result in irreparable harm to its business and substantial going

2333943

concern value being destroyed. The credit provided under the Post-Petition Revolving Credit Facility will enable the Company to continue to pay salaries and operate its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. This availability of credit hopefully can provide the Company's vendors and suppliers the confidence that will enable and encourage them to continue their credit and/or other relationship with the Company, or will provide the Company with liquidity to afford cash terms to certain extent. Accordingly, the timely approval of the relief requested herein is imperative.

53. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d)(1) of the Bankruptcy Code provides that the Court may authorize a debtor to incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (a) the debtor is unable to obtain such credit otherwise, and (b) there is adequate protection of the interest of the holder of the lien on which such senior or equal lien is to be granted. Section 364(d) is not applicable, as PNC is the senior lender. The Debtors propose to obtain the financing set forth in the Post-Petition Revolving Credit Facility by providing, *inter alia,* superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2) and (3) of the Bankruptcy Code (the financing under the senior debt facility will not create a priming situation where one did not previously exist; therefore the Company is not

2333943

attempting to obtain financing secured by a senior or equa;l lien on property that is subject to a lien as set forth in Section 364(d)).

54.     The Debtors' liquidity needs can be satisfied only if they are authorized to borrow funds under the Post-Petition Revolving Credit Facility and to use such proceeds to fund operations.   The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).   The Debtors have also been unable to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein that did not require a priming fight with PNC.

55.     Having determined that financing is available only under sections 364(c) of the Bankruptcy Code, the Debtors negotiated with the PNC at arm's length.   Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., See, e.g, Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789* F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs., 14* B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985).

56.	First, the Debtors have been unable to procure the required funding absent the proposed claims and liens.  The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and to the extent applicable 364(d) of the Bankruptcy Code, and accordingly, the Post-Petition Revolving Credit Facility reflects the exercise of sound business judgment.

57.	Second, the Debtors need the funds to be provided under the Post-Petition Revolving Credit Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest.  Specifically, the Debtors need the funds to be provided under the Post-Petition Revolving Credit Facility to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide their products to the Debtors on substantially the same credit terms as during the pre-petition period.  Alternatively, the Company needs financing to pay ongoing expenses and to procure necessary inventory for servicing customers.  Absent the Post-Petition Revolving Credit Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute these chapter 11 cases, and the Debtors' vendors may refuse to provide the goods (and credit) the Debtors' businesses require.

58.	The terms and conditions of the Post-Petition Revolving Credit Facility were negotiated extensively by well-represented parties in good faith and at arm's length, and were the best that the Company could negotiate, given the fact that the notice of default by PNC precluded additional financing through the Revolving Secured Credit Facility.  Accordingly, the PNC and all obligations incurred under the Post-Petition Revolving Credit Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

2333943

59.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Facility Agreement, and to take various actions without further order of or application to the Court. However, the DIP Agent must provide the Debtors and any official committee, with five (5) business days written notice to seek an injunction prior to exercising any enforcement rights or remedies in respect of the collateral or upon a shorter period of time after notice and a hearing.  Therefore the Debtors and official committees reserve the right to seek injunctive relief to maintain non-consensual use of cash collateral post-termination event (not to force continued lending).

60.     Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Amended Credit Agreement, the Post-Petition Revolving Facility Agreement and the proposed Orders.

**B.  The Use of Cash Collateral Should be Authorized**

61.     Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or approval from the Court.[5] PNC has consented to the Company's use of PNC's cash collateral in conformity with this

---

[5]     Section 363(c) provides, in relevant part:

> (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –
> > (A)     each entity that has an interest in such cash collateral consents; or
> > (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c).

Motion. Further, section 363(e) provides that "on request of an entity that has an interest in property…proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the cash collateral.

62.     For the use of the cash collateral, the Company is granting PNC replacement Pre-Petition Lender Liens (to the extent of any diminution) on Post-Petition Collateral, with such Post-Petition Collateral as well to be Collateral for post-petition advances under the Line of Credit, in accordance with the Post-Petition Revolving Credit Facility. The Company believes that such replacement liens will adequately protect PNC for the use of Pre and Post-Petition cash collateral.

63.     The Company will also provide PNC with required weekly reporting of financial information relating to projected revenues and expenses, actual revenue and expenses, and variances from the Budget, as applicable, as well as reasonable access to, among other things, the Company's management, books, and records, including the reporting required under the Post-Petition Revolving Credit Facility. *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request of MBL for 'timely filing of proper monthly operating reports…' falls within the ambit of adequate protection…"); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (reports required as part of adequate protection).

64.     The Company submits that the replacement liens and the provision of timely financial reporting will adequately protect PNC for the use of Pre and Post-Petition cash

2333943

collateral. Thus, PNC's interests are adequately protected, and the requirements for adequate protection under Bankruptcy Code §§ 361 and 363 have been satisfied. The replacement liens (subordinate) in favor of 3-K Partners will also protect the value of its lien claims.

65.     While not part of the Post-Petition Revolving Secured Facility, the Amended Credit Agreement (as reflected in the Budget) requires that the two Senior Secured Equipment Term Loans be maintained in current status post-petition. This is one of the effects of the "roll up" of the pre-petition debt owned PNC into the Amended Credit Agreement—these loans become post-petition loans and must be paid as though incurred by the estates after commencement of the Cases. As the full "roll up" is not to occur unless approved at the final hearing upon this motion, the Company does not seek as interim relief the approval of the full "roll up" of the pre-petition debt into the Amended Credit Agreement. However, failure of this condition would result in a termination of the right of the Company to (i) use cash collateral under the agreement reached with PNC and (ii) to borrow further under the Amended Credit Agreement.

**C.  The Debtors Require Immediate Access to Cash Collateral and the DIP Facility.**

66.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Bankruptcy Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. The Debtors request that the Bankruptcy Court conduct an expedited preliminary hearing on the Motion (the "Preliminary Hearing") and authorize the Debtors to use the Cash Collateral for the 3-week period detailed within the Interim Budget and in accordance

2333943

with the terms of the Interim Order and the Interim Budget (with allowance of a 10% variance as to each line item contained within the Interim Budget).

67.    The Budget itemizes the sources and uses of cash and provides a weekly projection of cash receipts and expenditures, and provides a list of reasonable and necessary business expenses that must be paid in order to continue the Debtors' business until a final hearing on the Motion can be held.  The terms and conditions of the Budget and the proposed Interim Order are fair and reasonable, and reflect the exercise of the Debtors' prudent business judgment consistent with the fiduciary duties of a debtor-in-possession.

68.    The Debtors have an immediate need to use the Cash Collateral, including cash proceeds, to continue to operate their businesses.  Without those funds, the Debtors will not be able to make cash expenditures for necessary costs incurred during their reorganization, including but limited to, wages, salaries, rent, professional fees and other expenses that arise in the administration of the bankruptcy cases and in the ordinary course of the Debtors' businesses. The Debtors have little to no unencumbered cash with which to operate their businesses – accordingly, if the Debtors are unable to use the Cash Collateral, the Debtors will be forced to immediately cease business operations, which will negatively impact the value of their assets, cause irreparable harm to the estates, and eliminate the prospect of unsecured creditors receiving a distribution on account of their claims.

69.    The Cash Collateral that the Debtors propose to spend in the Interim Budget will be in an amount necessary to prevent the Debtors from suffering "immediate and irreparable harm" and therefore meets the requirements for interim relief under Bankruptcy Rule 4001(b)(2) and 6003.

2333943

**D. The Debtors will Provide Adequate Protection of PNC's Interest in Cash Collateral.**

70.    Section 363(e) provides that "on request of an entity that has an interest in property used, sold, or leased…by the trustee, the court, without or without hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  The provision governing adequate protection is not subject to a debtor's discretion, and is geared to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case.  *See In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr.. D. Nev. 2012) ("use of the cash it generates in its operations is itself a form of adequate protection. This is because [debtor's] continued investment in, and operation of, the [collateral] will increase, or at least maintain, the collateral's value."); *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006); *In re Ralar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection").

71.    Although the Bankruptcy Code does not provide an all-encompassing definition of what constitutes adequate protection, section 361 provides a non-exhaustive list of factors that may constitute adequate protection.  A determination of adequate protection is decided on a case-by-case basis, and involves a consideration of the "nature of the creditor's interest in the property, [and] the potential harm to the creditor as a result of the property's decline in value of the method of protection."  *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986).

72.    Exactly what constitutes adequate protection must be decided on a case-by-case basis.  *In re Energy Partners, Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009) (citing *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).  Adequate protection preserves the status quo for secured creditors.  *In re Good*, 428 B.R. 235, 241 -242 (Bankr. E.D. Tex. 2010).  Adequate

2333943

protection exists by virtue of augmentation (or preservation) of the value of a secured creditor's collateral. *See*, *In re Ralar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection"); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716-17 (Bankr. D. Del. 1996) (court found secured creditor was adequately protected given lack of evidence that collateral was diminishing, debtor had operated profitably and was projected to continue operating profitably).

73.     First, the Debtors propose to adequately protect the interest of all secured creditors, including the Pre-Petition Lenders, in several different ways.  First, the Debtors will continue to maintain bank accounts with PNC and deposit all post-petition Cash Collateral into such accounts to be utilized only for the normal and necessary costs of business and administration of the bankruptcy estates pursuant to the Interim Order.

74.     Second, the Debtors will maintain adequate assurance coverage and operational production in relation to the prepetition collateral and timely pay all post-petition taxes assessed in relation to the prepetition collateral in the ordinary course of the Debtors' businesses, thereby keeping the properties free of additional liens.

75.     Third, the Debtors propose to grant PNC, to the extent they hold any valid pre-petition liens, first priority liens and security interests in the Debtors' Post-Petition Cash Collateral as set forth herein and in the Interim Order.  The Debtors propose to grant PNC replacement liens, to the extent their pre-petition liens were properly perfected as of the Petition Date, upon: (i) all assets in which PNC holds a validly perfected lien as of the Petition Date; (ii) all property acquired after the Petition Date that is of the exact nature, kind or character of the Pre-petition Collateral; and (iii) all cash and receivables that are the proceeds, products, offspring, or profits of the Pre-petition Collateral.  The Debtors further propose to grant PNC

2333943

first priority liens and security interests in avoidance actions under chapter 5 of the Bankruptcy Code. The Debtors anticipate that the aforementioned first priority liens and security interests will adequately protect the PNC from any diminution in the value of their interest in their collateral resulting from the use of the Cash Collateral. *In re First Douth Sav., Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (granting a creditor replacement liens to the extent of diminution in the value of their security interest constitutes adequate protection under section 361).

76.     These same liens, as regards A&B, shall be granted as subordinate liens in favor of 3-K Partners as adequate protection of its pre-petition lien rights (which are subordinate to those of PNC).

77.     Furthermore, the Debtors will provide lenders with accurate and detailed information relating to projected revenues and expenses, actual revenues and expenses, and variances from the Budget – all of which will enable the Prepetition Lenders to monitor the use of the pre-petition collateral and Post-Petition Cash Collateral. Provision of financial reports can constitute a valid form of adequate protection. *Mutual Benefit Life Ins. Co. v. Stanley Station Assoc's, L.P. (In re Stanley Station Assoc's, L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe that the request…'for timely filing of proper operating reports…' falls within the ambit of adequate protection…").

78.     The Company submits that the Pre-Petition Lenders' interests are adequately protected, and the requirements for adequate protection under Bankruptcy Code §§ 363 and 364(d)(1) have been satisfied.

## INTERIM RELIEF REQUESTED

79.     The Debtors believe that the relief sought in this Motion is critical to achieving a smooth transition towards operation as chapter 11 debtors, and will help preserve the Debtors'

2333943

going-concern value. The interim relief requested herein, including use of Cash Collateral, and including, on an interim basis, use of the Post-Petition Revolving Facility during the interim period and prior to entry of a Final Order, is necessary to avoid immediate and irreparable harm. Accordingly, the Debtors request immediate entry of an Interim Order to be submitted in open court, pursuant to Bankruptcy Code §§ 363 and 364 and Bankruptcy Rule 4001(b)(2) and (c)(2).

## NOTICE

80.     Notice of this Motion has been given to all parties on the Special Notice List, including, without limitation: (i) the Office of the United States Trustee; (ii) the Debtors and their counsel; (iii) PNC Bank, National Association; (iv) 3K Partners, Ltd.; (v) Community Bank; (vi) Toyota Motor Credit; (vii) the twenty (20) largest unsecured creditors of A&B Valve and Piping Systems, L.L.C.; Kimzey Casing Service, LLC; Sheffield GP, LLC; and Sheffield Holdings, LP; and (viii) governmental agencies having a regulatory or statutory interest in these cases. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

81.     The Debtors respectfully request that this Bankruptcy Court enter an order: (i) authorizing the Debtors to obtain post-petition financing as detailed herein pursuant to 11 U.S.C. §§ 364(c) and to the extent applicable 364(d); (ii) authorizing the Debtors to use the Cash Collateral pursuant to 11 U.S.C. § 363(c) on an interim basis in accordance with the terms and conditions set forth within this Motion, the Budget, and the Interim Order; (iii) granting adequate protection pursuant to 11 U.S.C. § 361 as contemplated by this Motion; (iv) scheduling a final hearing on the Motion on a date that is not earlier than 15 days following the filing of this Motion; and (v) granting such other and further relief as is just and proper.

2333943

Respectfully submitted,

**GORDON, ARATA, MCCOLLAM,
   DUPLANTIS & EAGAN, LLC**

By: **_/s/ Louis M. Phillips_____**
Louis M. Phillips (La. Bar No. 10505)
Peter A. Kopfinger (La. Bar No. 20904)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: lphillips@gordonarata.com
Email: pkopfinger@gordonarata.com

      AND

Armistead M. Long (La. Bar No. 33949)
400 East Kaliste Saloom Road, Suite 4200
Lafayette, Louisiana 70508
Email: along@gordonarata.com
Phone: (337) 237-0132
Fax: (337) 237-3451

      AND

Patrick "Rick" M. Shelby
(La. Bar No. 31963)
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Email: pshelby@gordonarata.com
Telephone: (504) 582-1111

*Proposed Attorneys for A&B Valve and Piping
Systems, L.L.C.; Kimzey Casing Service, LLC;
Sheffield GP, LLC; and Sheffield Holdings, LP*

2333943