# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 15-51336 |
| A&B VALVE AND PIPING SYSTEMS, L.L.C., *et al.*, | JOINTLY ADMINISTERED[1] |
| | CHAPTER 11 |
| DEBTORS | CHIEF JUDGE ROBERT SUMMERHAYS |

**MOTION, WITH SUPPORTING AUTHORITY, FOR ORDERS
(I)(A) AUTHORIZING AND APPROVING BIDDING AND SALE
PROCEDURES, AND (B) AUTHORIZING AND APPROVING NOTICE
PROCEDURES AND SETTING A HEARING DATE FOR SALE HEARING,
(II) AUTHORIZING THE SALE FREE AND CLEAR OF ALL LIENS,
CLAIMS AND INTERESTS AND (III) FOR RELATED RELIEF**

Debtors-in-possession, A&B Valve and Piping Systems, L.L.C.; Kimzey Casing Service, LLC; Sheffield GP, LLC; and Sheffield Holdings, LP (collectively, the "Debtors" or the "Company") hereby move this Court (the "Motion") for the entry of Orders substantially in the form attached hereto as Exhibit A and Exhibit B pursuant to sections 105 and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i)(a) authorizing and approving the bidding and sale procedures (the "Bidding and Sale Procedures") attached hereto as Exhibit C in connection with the proposed sale of the Assets (as defined below) by the Debtors (the "Sale Transaction"), (b) authorizing and approving the forms of Notice attached hereto as Exhibit D, and approving the manner of solicitation of bids and notice of the Sale

---

[1] Kimzey Casing Service, LLC (15-51337); Sheffield Holdings, LP (15-51338); and Sheffield GP, LLC (15-51339) are being jointly administered with A&B Valve and Piping Systems, LLC (15-51336) pursuant to this Court's order entered on October 20, 2015 (ECF Doc. 32).

Transaction (collectively, the "<u>Notice Procedures</u>"), (c) setting the time, date and place of a hearing to consider the Sale Transaction (the "<u>Sale Hearing</u>"), (ii) authorizing and approving the sale of the Assets free and clear of all liens, claims and Interests, and (iii) granting the Debtors such other and further relief as the Court deems just and proper.  In further support of this Motion, the Debtors respectfully represents as follows:

## Jurisdiction and Background

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105 and 363 of the Bankruptcy Code, Rules 2002, 6004 and 9014 of the Bankruptcy Rules.

## Chapter 11 Filing

3.     On October 16, 2015 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), commencing these cases (the "<u>Cases</u>").

4.     Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.     As of the date of this Motion, no official committee of unsecured creditors has been appointed.

## Events Leading to Chapter 11[2]

6.     A&B Valve and Piping Systems, L.L.C. ("<u>A&B</u>") is a Louisiana limited liability company engaged in the business of stocking and distributing pipes, valves, fittings, flanges,

---

[2]     For a more detailed description of the factual background and circumstances leading to the commencement of these Cases, the Court is referred to the Declaration of Ryan A. Maupin, filed as ECF Doc. 3.

2

5141147v2

fasteners, and general oilfield supplies primarily in Louisiana and Texas. A&B was formed in 2009 and shortly thereafter merged with A&B Valve and Piping Systems, LP, a Texas limited partnership (the "A&B Predecessor"). A&B maintains its principal office in Broussard, Louisiana, and is the ultimate parent entity of the Company, as illustrated below:



7.      A&B is an operating and holding company. The business operations of A&B are primarily stocking and distributing a broad array of products consisting primarily of pipes, valves, fittings, flanges, fasteners, and general oilfield supplies to the upstream and midstream oil and gas industries. A&B operates six (6) leased warehouse facilities in Louisiana and Texas, with each maintaining a unique product inventory with thousands of items. A&B sources its products from hundreds of manufacturers and distributors. Nearly all of A&B's business involves work on an order-by-order basis without long-term contractual commitments by customers. Such orders typically involve multiple items, some of which A&B has in inventory and others that must be sourced from third parties. Due to the long lead-time for sourcing certain items, A&B historically purchases these inventory items in anticipation of customer orders and upcoming projects. A&B's aggregate inventory at cost is approximately $13.1 million. A&B maintains its own fleet of 116 trucks and trailers and also uses third party logistics providers to deliver products to its customers. As of the Petition Date, A&B has approximately 73 full-time employees, including 5 insiders.

3

8.     Kimzey Casing Service, LLC ("KCS") is a Texas limited liability company that is 100 percent owned by A&B.  KCS is engaged in the business of providing casing running services for oil and gas drilling primarily in Colorado, Pennsylvania and West Virginia.  KCS was formed by the A&B Predecessor in 2007 and has its headquarters in Denver, Colorado.

9.     KCS employs specialized crews and heavy trucks and equipment to provide casing installation services for oil and gas wells.  Well casing consists of a series of steel pipes that are installed in all oil and gas wells after they have been drilled.  Casing prevents the walls of the wellbore from caving in, prevents the uncontrolled flow of fluids into or out of the wellbore, and improves the efficiency of production by providing a conduit to deploy downhole production equipment and tubing.  KCS's crews, equipment and fleet of trucks operate out of two facilities, one in Colorado and the other in Pennsylvania.  As of the Petition Date, KCS has approximately 60 full-time employees, including 1 insider.

10.     Sheffield Holdings, L.P. ("Sheffield") is a Pennsylvania limited partnership formed in 2012 to acquire real estate in Washington County, Pennsylvania.  Sheffield is 99 percent owned by A&B and 1 percent owned by Sheffield GP, LLC ("GP"), a Pennsylvania limited liability company formed in 2012.  GP is 100 percent owned by A&B.  The real estate owned by Sheffield is rented to KCS. Sheffield has no employees.

11.     These bankruptcy proceedings occur during a turbulent period in the oil and gas industry driven by a dramatic decline in oil prices exceeding 50 percent in one year as well as a significant drop in rig counts in key geographic regions where both A&B and Kimzey conduct business.  The recent decline in oil prices and active drilling rig counts coupled with the liquidity that has been taken out of the market with respect to reserve based loans has forced key customers to cut overhead and capex budgets, thus negatively impacting the Company's

4

revenues. Prior to the drop in oil prices, the Company's consolidated revenues totaled approximately $93M in 2013 and 2014, respectively. Trailing 12 months revenue through August 2015 totaled approximately $68M, a 33% decrease from TTM August 2014. For the periods YTD August 2014 vs YTD August 2015, revenues were down another 38%. Key customers addressed industry problems by delaying payments to the Company, and the Company was forced to respond accordingly by delaying payments to their vendors. As industry uncertainty prompted customers to change their ordering patterns and delay projects, the Company's inventory levels rose. Similarly, cash strapped vendors began tightening credit limits and terms with the Company as well. Dwindling revolver availability due to lowering advance rates compounded these working capital problems, causing the Company to be closer and closer to running out of liquidity each month.

12.     The Company attempted to negotiate with its primary lender, PNC Bank, National Association ("PNC"), to ease the cash constraint issues and potentially avoid a bankruptcy filing. The Company believed that if PNC increased the advance rate on eligible inventory to be consistent with prior levels or alternatively would agree to provide an "overadvance" on eligible inventory using current advance rates, the Company may have be able to survive the industry downturn. These conversations failed to produce a workable solution.

13.     The Company also sought an infusion of equity capital from their owners. The owners were unwilling to provide additional equity capital without a comprehensive balance sheet solution given the substantial amount of secured and unsecured debt and pending litigation.

14.     On October 1, 2015, PNC issued a default letter to A&B and KCS citing the Material Adverse Effect clause of the PNC pre-petition Credit Agreement and noting that information provided by the Company requesting debtor-in-possession financing for the

5141147v2

Company's proposed bankruptcy cases as a result of current and projected negative cash flow of the businesses constituted a default. The Debtors in fact had run out of liquidity as of the filing of the Cases, and obtained authorization to make a draw on or about October 16, 2015 to allow the Company to make payroll (after receipt of the default notice from PNC). The Company chose to institute bankruptcy and make an agreement with PNC for the right of the Company to use its cash collateral, maintain borrowing under the PNC pre-petition Credit Agreement, and have the Company seek Court approval of bidding procedures for conducting an auction and selling each Debtors' Assets. The Company believes that this approach was most likely to preserve the possibility of identifying a stalking horse or other bidder(s) for the Company or its components on a going concern basis, so as to preserve the going concern value of the businesses and Company operating components, and preserve the prospect of obtaining through the bankruptcy process value for creditors other than PNC.

### Debtor-In-Possession Financing and Need for a Section 363 Sale

15.     As of the Petition Date, the Company did not have sufficient cash to operate its business and pay operating expenses without further advances by PNC under the PNC pre-petition Credit Agreement. Furthermore, PNC controls lockboxes for the Company's receivables and incoming proceeds from collections were insufficient to maintain operations. On October 19, 2015, the Bankruptcy Court approved the Company's request for debtor-in-possession financing ("DIP Loan") granted by PNC to be made pursuant to the Senior Secured, Superpriority, Debtor-in-Possession Revolving Credit, Term Loan, Equipment Loans and Security Agreement dated as of October 21, 2015(the "DIP Credit Agreement"), among the Debtors, and PNC, as Agent and lender.

16. As a condition to the DIP Loan and Debtors' use of cash collateral, the Company and PNC agreed to comply with the following milestones (the "Milestones"): (i) within five (5) days after the Petition Date, the Debtors shall file a motion with the Bankruptcy Court requesting entry of an order approving the bidding procedures and auction process to be employed for the Sale Transaction and providing for PNC's right to "credit bid" for all or any portion of the Assets; (ii) on or before the date that is thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Procedures Order; (iii) on or before December 9, 2015, the Debtors shall have held an auction in connection with the Sale Transaction and in accordance with the provisions set forth in the Sale Procedures Order; (iv) on or before December 16, 2015, the Bankruptcy Court shall have entered the order (the "Sale Order") approving the Sale Transaction; and (v) on or before December 18, 2015, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h), the Sale Transaction shall have closed, with the proceeds of the Sale Transaction to be paid directly to creditors in accordance with the provisions of the DIP Loan.

17. The Company agreed to these Milestones because the Company believes such Milestones will expedite a sale process that is necessary, limit any loss of collateral value, and allow the Company to continue operating as a going concern for the benefit of these estates and all interested parties through the sale process. To satisfy these Milestones, access to cash collateral and the DIP Loan was necessary and critical over the next 60-days.

## Relief Requested

18. By this Motion, the Debtors seek orders (i) authorizing and approving the sale of the Debtors' right, title and interest in and to substantially all of each Debtors' immovable property and buildings and improvements thereon and movable property (the "Assets") to

5141147v2

successful bidder(s) free and clear of all liens, claims and interests as provided in the Purchase

Agreement (defined below), and (ii)(a) authorizing and approving the Bidding and Sale

Procedures, (b) authorizing and approving the Notice Procedures, and (c) setting the time, date

and place of the Sale Hearing, and (iii) granting the Debtors such other and further relief as the

Court deems just and proper.

## The Purchase Agreement

19.     The Debtors propose to offer for sale the Assets in a competitive sale.  Each

Debtor is preparing an asset purchase agreement ("Purchase Agreement") to be executed by

potential bidder(s), which will include provisions substantially similar to the following:

**Assets**. The Assets will consist of the assets sought to be acquired by the purchaser which

may include immovable property and buildings and improvements thereon and movable property

or its components, as necessary.[3]

**Sale Free and Clear**. The Assets to be transferred by each Debtor will be transferred free

and clear of all liens, claims and interests, other than those expressly assumed by the purchaser

or otherwise expressly permitted under each Purchase Agreement.

**Sale As Is, Where Is and Without Warranties**. The Assets of each Debtor will be sold

on an "as is, where is" basis and without any representations or warranties, express or implied, of

any kind, nature, or type.

**Closing Conditions**. Certain customary closing conditions, including conditions relating

to bankruptcy court approvals.

---

[3]     Sheffield GP, LLC has no assets other than its one percent interest in Sheffield Holdings, LP.

5141147v2

## The Bidding and Sale Procedures

20.     The Company has determined, in the exercise of its business judgment, that a sale pursuant to the Bidding and Sale Procedures will provide the best opportunity to maximize the reasonable value of each of the Debtors' Assets.

21.     Credit bidding will be authorized in accordance with the Bidding and Sales Procedures.

## Notice Procedures

22.     The Company will seek an expedited hearing for the approval of the Bidding and Sale Procedures and for the setting of the date, place and time of the Sale Hearing.[4]

23.     Upon entry of an Order setting the date, place and time of the expedited hearing on the approval of the Bidding and Sale Procedures and setting a Sale Hearing, the Company will circulate the Order to the Special Notice List, including, without limitation: (i) the Office of the United States Trustee; (ii) the Debtors and their counsel; (iii) PNC Bank, National Association; (iv) 3K Partners, Ltd.; (v) Community Bank; (vi) Toyota Motor Credit; (vii) the twenty (20) largest unsecured creditors of A&B Valve and Piping Systems, L.L.C.; Kimzey Casing Service, LLC; Sheffield GP, LLC; and Sheffield Holdings, LP; (viii) counsel for any creditor's committee that may be duly formed and approved; and (ix) governmental agencies having a regulatory or statutory interest in these cases (collectively, the "Notice Parties").

24.     Upon entry on an Order approving the Bidding and Sale Procedure and setting the date, place and time of the Sale Hearing (the "Bidding and Sale Procedures Order"), the Company will provide notice substantially in the form proposed in Exhibit D  attached hereto to the Notice Parties.

---

[4]     At the hearing on the First Day Motions, the Court agreed to set the expedited hearing for November 2, 2015 at 11:00 a.m. (CST), with objections permitted to be raised in open Court at the hearing.

5141147v2

25.     Only those objections made in writing to the Debtors prior to the Sale Hearing will be considered by the Bankruptcy Court.  The failure of any objecting person or entity to file its objections and or appear in open Court to have its objections heard will result in a bar to the assertion of any objection, and shall be deemed to be "consent" for purposes of Section 363(f).

## Assumption and Assignment of Contracts

26.     The Company is currently assembling a list of contracts related to each Debtors' Assets.  To the extent that the Company deems it necessary to assume and assign any contracts pursuant to Section 365 of the Bankruptcy Code in conjunction with the Sale Transaction, the Company will file a separate motion seeking approval for such assumptions and assignments prior to the date of the proposed Sale Transaction.

## BASIS FOR RELIEF

## Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment

27.     Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part:  "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

28.     Numerous courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. *See In re Continental Air Lines, Inc.* 780 F.2d 1223 (5th Cir.1986) (recognizing that implicit in § 363(b) that the sale must be justified by the debtor in possession or trustee, and that the debtor in

10

possession or trustee has a fiduciary duty to parties in interest); *In re Abbotts Dairies of Pa.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 421 (Bankr. S.D. Tx. 2009) (providing that a chapter 11 debtor must establish a valid business justification for seeking approval of a transaction under Section 363).

29.     Certain factors should be considered to establish a valid business justification, including: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that there is a need for a quick sale to avoid adverse, looming, market or business conditions; (3) that the assets have been aggressively marketed; (4) that the fiduciaries controlling the debtor are truly disinterested as to any benefit to be obtained from the proposed sale; (5) that accurate and reasonable notice has been provided to interested persons; (6) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (7) that the sale is proposed in good faith. *Id.* at 422; *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.*, 82 B.R. at 335-36; *see also In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

30.     The proposed procedures for the sale of each of the Debtors' Assets satisfies these factors. First, sound business purposes justify the Sale Transaction. The Company believes that a prompt sale of the Assets conducted pursuant to the Bidding and Sale Procedures presents the

best opportunity to realize the maximum value of the Assets for distribution to these bankruptcy estates and its creditors.  Furthermore, the Sale Transaction is contemplated by the DIP Loan and is one of the Milestones that the Company agreed to meet to obtain the DIP Loan.  The Company further believes that any value available for creditors will be substantially reduced, if not wiped out, absent a timely Section 363 sale.  *See In re Lionel Corp.*, 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

31.     Second, given the market conditions which are driving an interest in the acquisition of the Assets, the Milestones set forth in the DIP Loan, and the termination of available operating funds by year-end, the quick sale proposed herein is justified.

32.     Third, the Company has aggressively marketed each Debtors' Assets for several weeks prior to the commencement of these bankruptcy proceedings in an effort to identify a stalking horse bidder.  The Company was unable to identify a single stalking horse interested in all Assets, but the Company has identified and shared certain due diligence information, subject to execution of a non-disclosure agreement, with a number of interested potential purchasers. The Company believes these estates will receive maximum benefit through a 363 sale because the Bidding and Sale Procedures contemplate a competitive bidding process.

33.     Fourth, the fiduciaries controlling the Company, Ryan A. Maupin and Douglas Brickley, are disinterested in all respects other than that they were employed by as oficers of the Debtors prior to the commencement of these Cases. *See* Application to Employ Douglas J. Brickley as Manager and Chief Restructuring Officer (ECF Doc. 12) and Application to Employ Ryan A. Maupin as Interim Chief Executive Officer (ECF Doc. 13).  These fiduciaries will not

5141147v2

benefit from the sale proposed herein, in that neither will retain or obtain any interest in the purchase price or any purchaser of Assets, and cannot bid directly or indirectly for the Assets.

34. Fifth, the Company seeks as part of this Motion to establish the Bidding and Sale Procedures for accurate and reasonable notice to creditors and other prospective bidders. Under the circumstances of these Cases, the Company submits that the notice period proposed satisfies the requirements of the Bankruptcy Rules, *see* Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

35. Sixth, the proposed Bidding and Sale procedures establish that except for the requirement that the liens securing the allowed claims of PNC and any other holder of an allowed secured claim will attach to and be paid by the proceeds from the sale of collateral, no other distribution mechanics are to be pre-approved by the granting of the relief requested herein.

36. Finally, the proposed Bidding and Sale Procedures satisfies the good faith requirement of *Abbotts Dairies*. The Company submits that the sale process will be conducted in good faith, with arm's length negotiations with respect to the price and other terms of the sale of the Assets between each of the Debtors and the highest and best bidder(s).

37. As set forth above, the Company has demonstrated compelling and sound business justifications for authorizing the sale of the Assets and the Bidding and Sale Procedures. The sale of the Assets pursuant to the Bidding and Sale Procedures is the only way for the Company to maximize the recoveries to creditors. Accordingly, the Company requests that the Bankruptcy Court approve the proposed Bidding and Sale Procedures and approve the Sale Transaction presented to the Bankruptcy Court at the Sale Hearing and authorize the Company to take such other steps as are necessary to consummate the Sale Transaction.

5141147v2

## The Proposed Sale Does Not Constitute a *Sub Rosa* Plan

38.     The elements of a *sub rosa* plan are not present here as the sale of the Assets does not: (i) have the practical effect of dictating the terms of any future plan, (ii) disenfranchise voting rights under a plan, and (iii) provide for the release of any claims against the Debtors.

39.     The long history of bankruptcy reorganizations in this country is replete with examples of debtors, facing circumstances similar to those the Debtors face here, obtaining court approval (often at the outset of the case) to sell substantially all of its assets prior to the process of confirming a plan, in order to preserve the maximum value for the sale of the assets being sold.  In *Piccadilly*, for example, the Supreme Court addressed a tax dispute that arose after the debtor received bankruptcy court approval for the sale of substantially all of its assets three months after it filed its chapter 11 case.  While Justice Breyer dissented from the majority's opinion in that case as to the proper tax treatment of the sale, he explained the justification for such sales at the outset of chapter 11 cases in appropriate circumstances: "[O]ne major reason why a transfer may take place before rather than after a plan is confirmed is that the preconfirmation bankruptcy process takes time…  And a firm (or its assets) may have more value (say, as a going concern) where sale takes place quickly…  Thus, an immediate sale can often make more revenue available to creditors or for reorganization of the remaining assets." *Piccadilly*, 554 U.S. 33, 56 (2008) (7-2 decision) (Breyer, J., dissenting) (citations omitted).

40.     Similarly, in *In re Trans World Airlines, Inc.*, 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001), the court entered an order approving the sale of substantially all of TWA's assets at the very outset of the chapter 11 case where "TWA had no other strategic transaction available to it and had no other offer for value to which it could turn.  Nor could TWA rely on its self-help plan because TWA was unable to procure adequate capital infusion to implement that plan. Its

14

only alternative was a free fall chapter 11 filing with the high likelihood of a piecemeal liquidation of the enterprise." *TWA*, 2001 WL 1820326, at *4. In denying requests for a stay pending appeal of its sale order, the court found:

> [T]here is a substantial public interest in preserving the value of TWA as a going concern and facilitating a smooth sale of substantially all of TWA's assets to American. This includes the preservation of jobs for TWA's 20,000 employees, the economic benefits the continued presence of a major air carrier brings to the St. Louis region, and preserving consumer confidence in purchased TWA tickets American will assume under the sale… [T]he Sale Order implements the public interest that favors an organized rehabilitation (albeit here as only a part of a larger viable enterprise) of a financially distressed corporation which lies at the core of chapter 11. I conclude that the alternative to the Sale Order in this case is a free-fall chapter 11 leading to a liquidation with the subsequent substantial disruption of diverse economic relationships and likelihood of material adverse harm to a very broad spectrum of creditor constituencies.

*Id*. at *14.

41.     Piccadilly and TWA are just two examples from the long history of reorganization courts exercising their authority to approve a sale of substantially all the assets of a debtor prior to the plan process to preserve the maximum value for the assets being sold.[5] When Congress

---

[5]     *See e.g.*, *In re Decora Indus., Inc.*, 2002 WL 32332749, *3 (D. Del.) (approving 363(f) sale of substantially all assets of chapter 11 debtor that had no source of future financing: "Debtors have two alternatives: (1) proceed with the Proposed Transaction, or (2) terminate business operations, employees and commence a liquidation of assets… All parties agree that an asset sale, as opposed to liquidation, will provide more money to the estate to satisfy the creditors' claims, as well as maintaining the going concern value of Debtors… [T]he Proposed Transaction, as with any sale, preserves the going-concern value of Debtors' business and the jobs of Debtors' employees."); *In re Med. Software Solutions*, 286 B.R. 431, 441 (Bankr. D. Utah 2002) (court approved sale of essentially all of debtor's assets at outset of chapter 11 case, finding (i) there would be substantial decrease in the value of the assets if not sold immediately, (ii) existing customers would be reluctant to purchase services and goods from company "in tenuous financial condition" and (iii) company would be "unsustainable as a going concern without additional capital - which is unavailable"); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 90 (Bankr. D. Md. 1988) (approving sale of operating subsidiary where purchase price exceeded its estimated liquidation value and "failure to close the sale quickly will likely result in a halt of [subsidiary]'s continuous operations. If [subsidiary] cannot be sold as a going concern, there will be a substantial decrease in its value to the Debtor's estate."); *In re Airlines Transp. Carrier*, 129 F. Supp. 679, 683 (S.D. Cal. 1955) ("The salutary purpose of the Bankruptcy Act is to preserve the assets of the bankrupt for the benefit of the creditors. An order authorizing the sale of the assets of the bankrupt is intended to effectuate this purpose."); *In re Strunks Lane & Jellico Mountain Coal & Coke Co.*, 64 F. Supp. 731, 733 (E.D. Ky. 1946) ("'Judicial sales are an indispensable part of the machinery employed in administering bankrupt estates.' Public policy requires that nothing be done to impair confidence in the stability of such judicial sales, and bona fide purchasers should not be deprived of their rights without just cause.") (citation omitted).

5141147v2

enacted section 363 of the Bankruptcy Code as part of the bankruptcy Reform Act of 1978, it codified what reorganization courts already knew: a debtor must be permitted to sell its assets during the course of a reorganization case when necessary to preserve value for the estate. As detailed below, the Sale Transaction – the only alternative available to the Company to preserve its business as a going concern – meets the requirements of section 363 for the sale of the Assets free and clear of all liens and other interests in the assets to be sold.

42.     Courts applying 363(b) have routinely authorized the sale of a debtor's operating assets in advance of the plan process where the debtor did not have sufficient liquidity to continue operating, and the cessation of operations was likely or certain to result in the debtor's inability to realize the maximum value of the assets being sold.[6]

43.     That is exactly the situation that the Company now faces.  Because delay in this instance will lead to an immediate and substantial loss in the value that is likely to be realized for the Assets (and a likely conversion of these Cases), the Sale Transaction should be approved. The Company simply seeks the authority to sell the Assets with any enforceable encumbrances upon the Assets to attach to the proceeds of the sale, subject to the rights and defenses of the Company or any party in interest and in no manner will have the effect of dictating the terms of

---

[6]     *See e.g.*, *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving sale of radio station where debtor lacked funds to continue operations and could lose broadcast license if station went off the air); *In re Brookfield Clothes, Inc.*, 31 B.R. 978 (S.D.N.Y. 1983) (approving sale of clothing manufacturer that had shut down due to lack of cash prior to petition date); *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 244 (Bankr. S.D. W.Va. 1996) (approving sale of coal producer that could not fund operations and was nearly out of cash needed to operate pumps that prevented mines from flooding); *In re WBQ P'ship*, 189 B.R. 97, 102-03 (Bankr. E.D. Va. 1995) (approving sale of nursing homes as necessary to protect going concern value); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992) (approving sale of ice cream producer that lacked cash needed to perform maintenance necessary to continue operations); *In re Titusville Country Club*, 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991) (approving sale of golf course at start of golf season where debtor had inadequate funds to maintain course for the season); *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (approving sale of radio station because of lack of funds needed to continue to operate); *Naron & Wagner, Chartered*, 88 B.R. at 90 (approving sale of computer business where debtor was unable to continue operations due to lack of liquidity); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving sale of tire plant that needed major capital infusion to reach necessary production levels); *In re Boogaart of Fla., Inc.*, 17 B.R. 480, 483 (Bankr. S.D. Fla. 1981) (approving liquidation of grocer operating at a continual loss).

5141147v2

any future plan, disenfranchising voting rights under a plan, and providing for the release of any claims against the Debtors. Accordingly, the Company's sale of the Assets will not be a *sub rosa* plan.

### Sale of the Assets Should Be Free and Clear of Liens, Claims and Interests

44.     Pursuant to section 363(f) of the Bankruptcy Code, the Company seeks authority to sell and transfer the Debtors' right, interest and title in each Debtors' Assets to the Winning Bidder(s) (as defined in the Bidding and Sale Procedures), free and clear of all liens, claims and interests except as set forth in each Debtor's Purchase Agreement executed with the Winning Bidder, with such liens, claims, and interests to attach to the proceeds of the sale of the Assets, subject to any rights and defenses of the Company and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

5141147v2

45.     With respect to each creditor asserting an interest, one or more of the standards set forth in Section 363(f)(1)-(5) will be satisfied.  Those holders of interests who do not object or who withdraw their objections to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to Bankruptcy Code § 363(f)(2).  Those holders of interests who do object will fall within one or more of the other subsections of Bankruptcy Code Section 363(f).

46.     A sale free and clear of liens, claims and interests is necessary to maximize the value of each Debtor's Assets. A sale of the Assets other than one free and clear of all interests would yield substantially less value for each Debtor's estate, with less certainty than a transaction free and clear of all interests.  The Sale Transaction contemplated by each Purchase Agreement is in the best interests of the Company, its estates and creditors, and all other parties in interest.  A sale free and clear of liens, claims and interests is particularly appropriate under the circumstances because any lien or claim in, to or against each Debtor's right, interest and title in the Assets that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Company with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Company or any party in interest.  The Company submits that holders of liens, claims and interests, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their liens, claims and interests.

47.     The Debtors seek to sell the Assets free and clear of any and all successor liability claims.  The Debtors submit that the additional publication notice being provided is sufficient notice to allow the sale of the Assets free and clear of any successor liability clams.  *See Charter Crude Oil Co. v. Petroleos Mexicanois*, 125 B.R. 650, 655 (M.D. Fla. 1991) ("[P]ublication notice is legally adequate notice to unknown creditors, whether they be sophisticated trade

5141147v2

creditors of individual tort claimants.") and *In re Thomas McKinnon Sec., Inc.*, 159 B.R. 146 (Bankr. S.D. N.Y. 1993) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (same).

### The Sale Procedures Are Appropriate Under the Circumstances

48.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business. 11 U.S.C. § 363. Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  *See, e.g., Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn.* (*In re Atlanta Packaging Prods., Inc.*), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

49.     The implementation of competitive sale procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate. The Company submits that the opportunity for competitive bidding embodied in the Bidding and Sale Procedures will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of each Debtor's Assets.

50.     The Company believes that the exploration of a potential sale of the Assets through a prompt sale process is the best way to maximize the value of the Assets for the benefit of their estates, creditors and other stakeholders.   Accordingly, the Company, in its business

5141147v2

judgment, has concluded that: (i) a prompt sale of the Assets is the best way to maximize value for these estates, and (ii) the proposed Bidding and Sale Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

### Notice of the Proposed Sale Is Reasonable Under the Circumstances

51.     The Company submits that the Notice Procedures as set forth above are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding and Sale Procedures.

### Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)

52.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to Section 363 are automatically stayed for fourteen (14) days after entry of the order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Rule 6004(h).

53.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally* 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

54.     Because of the potentially diminishing value of the Assets and the Milestones agreed upon in the DIP Credit Agreement, the Company must close the Sale Transaction

5141147v2

promptly after all closing conditions have been met or waived. Thus, waiver of any applicable stay is appropriate in this circumstance.

**Bankruptcy Rule 6003 Statement**

55.     Although, the Company seeks an expedited hearing on the establishment of procedures to sell the Assets, the actual sale of the Assets will not occur within twenty-one (21) days after the Petition Date.  As such, the Debtors are in compliance with Rule 6003.

**Notice/Previous Requests**

56.     Notice of the Motion has been given via first-class mail, facsimile, electronic transmission, hand delivery or overnight mail to to the Special Notice List, including, without limitation: (i) the Office of the United States Trustee; (ii) the Debtors and their counsel; (iii) PNC Bank, National Association; (iv) 3K Partners, Ltd.; (v) Community Bank; (vi) Toyota Motor Credit; (vii) the twenty (20) largest unsecured creditors of A&B Valve and Piping Systems, L.L.C.; Kimzey Casing Service, LLC; Sheffield GP, LLC; and Sheffield Holdings, LP; and (viii) governmental agencies having a regulatory or statutory interest in these cases.  The Company submits that under the circumstances no other or further notice is necessary.

57.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

**WHEREFORE**, the Debtors request that the relief requested herein be granted, and for such other relief as this Court may deem appropriate.

Respectfully submitted,

**GORDON, ARATA, MCCOLLAM,**
  **DUPLANTIS & EAGAN, LLC**

By: **_/s/ Louis M. Phillips_____**
Louis M. Phillips (La. Bar No. 10505)
Peter A. Kopfinger (La. Bar No. 20904)

21

One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: lphillips@gordonarata.com
Email: pkopfinger@gordonarata.com

AND

Armistead M. Long (La. Bar No. 33949)
400 East Kaliste Saloom Road, Suite 4200
Lafayette, Louisiana 70508
Email: along@gordonarata.com
Phone: (337) 237-0132
Fax: (337) 237-3451

AND

Patrick "Rick" M. Shelby
(La. Bar No. 31963)
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Email: pshelby@gordonarata.com
Telephone: (504) 582-1111

***Interim Attorneys for A&B Valve and Piping Systems, L.L.C.; Kimzey Casing Service, LLC; Sheffield GP, LLC; and Sheffield Holdings, LP***

5141147v2